COMMONWEALTH *vs.* DAVID MULLANE.

No. 03-P-834.

Middlesex. December 13, 2004. - April 22, 2005.

Present: GREENBERG, LAURENCE, & COHEN, JJ.

Further appellate review granted, 444 Mass. 1103 (2005).

*Evidence,* Prior misconduct.

At the trial of indictments charging the defendant with keeping premises for unlawful sexual intercourse, in violation of G. L. c. 272, § 6, and keeping a house of ill fame, in violation of G. L. c. 272, § 24, the judge erred in admitting in evidence testimony concerning prior bad acts, where the prior bad acts were not committed by the defendant or in his presence and did not appear to have a unique identifying connection with the separate events that gave rise to the instant case, and where, even if the evidence could somehow accurately be characterized as relevant to the issues before the jury in this case, any possible probative value was outweighed by its probable unduly prejudicial impact. [322-324]

Discussion of evidentiary issues and challenges to jury instructions that could arise in the event of a retrial of indictments charging the defendant with keeping premises for unlawful sexual intercourse, in violation of G. L. c. 272, § 6, and keeping a house of ill fame, in violation of G. L. c. 272, § 24. [324-326]

INDICTMENTS found and returned in the Superior Court Department on June 29, 2000.

A pretrial motion to suppress evidence was heard by *Sandra L. Hamlin,* J., and the cases were tried before her.

*George Hassett* for the defendant.

*David W. Cunis,* Assistant District Attorney, for the Commonwealth.

GREENBERG, J. We reverse the judgments of keeping premises for unlawful sexual intercourse (G. L. c. 272, § 6) and keeping a house of ill fame (G. L. c. 272, § 24) because of the erroneous admission of evidence, objected to by the defense but admitted by the judge. As will appear, the evidence involved an incident that occurred nineteen months prior to the episode at

issue and added little probative value to the Commonwealth's case, but at the same time created unfair prejudice against the defendant.

1. *Facts.* a. *August, 1999.* Police officers and defense witnesses told different stories during trial, but there was no doubt that unlawful sexual activity was taking place at 238 Broadway in Cambridge; the issue was whether the defendant knew and was in control of the premises in the late summer of 1999.[1]

For four days in late August, 1999, Cambridge police officers conducted a surveillance operation of 238 Broadway, a building owned by the Mullane Realty Trust, which the defendant owned. The two-story building, located in East Cambridge, housed several businesses. The targets of the investigation were Oasis Group, a massage parlor, and the Broadway Institute of Massage Therapy.[2]

On August 27, 1999, around 12:35 P.M., several Cambridge police officers, members of the "special investigations" unit, armed with a search warrant, conducted a raid of the premises. A newly minted member of the vice squad, posing as a customer of Oasis Group, walked into the waiting room and spoke to Katherine Mullane, the defendant's daughter, about obtaining a massage. The other members of the team waited outside to allow him approximately twenty minutes to see if his assigned masseuse would solicit him for sexual favors before they executed the warrant.

The plan went slightly awry when Katherine Mullane, having obtained the requisite entry fee of fifty dollars, immediately introduced the officer to "Adrianne," who led him down a corridor into her massage room. The officer disrobed and lay face down on the massage table, clad only with a towel. The back rub progressed, the two engaged in small talk, and the officer asked Adrianne whether she did any "extras." She asked him if he had ever had a massage before, and he said, "yes." At some point he indicated that he had been to the Old English Club for a massage. She then asked if he was a police officer, and he

---

[1]The indictments allege that the offenses occurred "on or about diverse [*sic*] dates" from June 8, 1999, through August 27, 1999.

[2]At the time of the relevant events, the institute was licensed by the Department of Education as a training school for massage therapy.

responded in the negative. There was some general talk about the price, and the officer stated he had seventy dollars with him. She indicated that he could roll over any time he wanted. This, of course, put a crimp in his plan because less than half of the planned twenty-minute waiting period had elapsed. A beeper that the officer had in his discarded trousers would not sound for another ten minutes, signaling the entry of the other police officers to execute the search warrant. Not wanting to raise Adrianne's suspicions, the officer flipped over onto his back. Adrianne removed her top and skirt and stood naked beside him. She began to stimulate his genitals, a sexual practice she called a "hand release." At this moment, the officer became apprehensive and said that he needed to use the bathroom. He stalled, and later, when he returned to the massage room, Adrianne asked him if he wanted her to finish. Just then, the beeper mercifully went off, and Detective Louis Cherubino, leading the team executing the warrant, knocked on the exterior door and announced the team's entry into the premises.

The police team found Katherine Mullane and Patrick Mullane, the defendant's son, behind the reception room window. The entry created enough commotion that the officer, who was still in the massage room with Adrianne, could hear noise and people shouting, "police, police." Slight pandemonium broke out as the police officers made their way into the various massage rooms. They came upon one unsuspecting customer, with his pants unzipped, standing next to a woman. The woman jumped up on the table and began to demonstrate stretching exercises.

During the search, Detective Cherubino seized numerous documents that purportedly linked the defendant to the businesses, few of which bore specific dates (and none of which were reproduced in the record). The officers collected, among other things, customer receipts, loose currency, and a small video camera that had been mounted on the wall above the reception area, along with over twenty videotapes. A forensic expert collected specimens from the various massage rooms, several of which turned out to contain semen and sperm cells.

The foregoing summary of testimony at trial covers the events that occurred on August 27, 1999, at Oasis Group, previously

known as Oasis Chiropractic. We now focus upon the evidence of the prior bad acts, which was admitted in evidence over objection.

b. *November, 1997 — January, 1998.* Just before the opening statements, the Commonwealth moved in limine to allow testimony about events that occurred at the same location about nineteen months before the events for which the defendant was indicted. At that time, from November 27, 1997, to January 22, 1998, there was a business at that location known as the Broadway Health Club. The Broadway Health Club and David Mullane were then being investigated. The prosecutor stated that, among other things, he would introduce evidence through two police officers that, in January, 1998, various types of sexual gratification were available at the Broadway Health Club in exchange for a fee. The prosecutor indicated that he would particularly focus on the fact that in 1998, if propositioned, officers were instructed to end a "massage" session early and that, in 1999, the police seized a number of signs posted at the establishment and endorsed by the defendant stating that the management was to be notified if sessions were ended early.[3] In answer to the argument that evidence along this line would not be relevant and would be unduly inflammatory, the prosecutor said it would establish the defendant's state of mind and his response, in 1999, to the earlier investigation. The prosecutor also contended that the evidence showed a modus operandi by which one of the employees of the Broadway Health Club (not Adrianne) also offered "extras" to paying customers. In response, the judge temporized and said she would conduct a voir dire of the two police witnesses at the appropriate time.

In his opening statement, the prosecutor followed the judge's admonition and made no mention of the so-called prior bad conduct evidence. In midtrial, as part of its case-in-chief, the Commonwealth called Detective Gerald Baptist of the Cambridge vice squad and Detective David Ritchie of the Malden police, who worked undercover with Baptist in 1998. After conducting a voir dire hearing, the judge ruled that their testimony was admissible. The judge specifically stated that the

---

[3]On appeal, this specific ground on which the admission of the evidence was originally sought was not argued as a basis for its admissibility.

evidence was relevant to "knowledge, state of mind and pattern or method of operation." The judge gave a limiting instruction before each of these witnesses testified. Each officer testified that in January, 1998, he investigated operations at the same location, known at that time as the Broadway Health Club. Baptist also stated that they were investigating the Broadway Health Club and David Mullane and that Baptist instructed Ritchie to pose as a customer and to try to obtain a "special" at the club.

Ritchie obliged, went to the club, and in the same fashion as the officer in 1999, selected a young woman named "Colleen." He described the scenario in detail, and it was faithful in all respects to the 1999 experience except that he escaped the indelicacy of the "special" by pleading poverty. Ritchie did not see the defendant during the course of his visit to 238 Broadway.

After Ritchie's and Baptist's testimony, the defense, we may surmise, could not simply pass over the incident as irrelevant. Katherine Mullane testified that throughout 1999, the defendant did not play any role in any of the business operations at 238 Broadway and that, subsequent to a heart attack, in February, 1999, he resigned as an officer and director of the corporation under which the Broadway Institute of Massage Therapy did business. His son gave similar testimony. Their testimony stood in stark contrast to several of the Commonwealth's witnesses who testified that the search turned up documents (some were admitted in evidence) that showed the defendant may have been actively engaged in the enterprise in 1999. The jury had to decide the issue of control based on the conflicting accounts of police witnesses cast against the testimony of the defendant's close family members.

The 1998 incident, as testified to by Baptist and Ritchie, received special attention in the prosecutor's closing argument. Four and one-half pages of transcript of the prosecutor's closing argument are devoted to a summary of Baptist's and Ritchie's testimony concerning the 1998 investigation. The prosecutor reminded the jury that it was the defendant and the Broadway Health Club that were under investigation at that time and laid emphasis on the instructions that Baptist (who was also involved in the raid in the instant case) gave to Ritchie. In discussing

what the prior acts show, the prosecutor stated: "The first thing it shows . . . is that there's a pattern of practice to what's going on at 238 Broadway, a pattern of practice." He quoted Ritchie's testimony in which Ritchie told the masseuse, Colleen, that he knew of a place in Kittery, Maine, that offered similar services. The prosecutor likened that exchange to the one in 1999 between the police officer and Adrianne in which the officer commented that he had previously had a massage at the Old English Club. Finally, at the end of the argument, the prosecutor attempted to connect the signs seized from the premises in 1999 (instructing employees to make an "incident report" to "Dave" when a massage was ended early) to the instruction Ritchie had received in 1998 to end the massage early if necessary to avoid "extras."

2. *Prior bad acts.* This court has recently had occasion to reiterate the basic principles governing the admission of testimony concerning prior bad acts. *Commonwealth* v. *Butler*, 62 Mass. App. Ct. 836, 842-847 (2005). As repeated in that case, "[i]t is a fundamental rule that the prosecution may not introduce *evidence that a defendant previously has misbehaved,* indictably or not, for the purpose of showing his bad character or propensity to commit the crime charged" (emphasis supplied). *Id.* at 842, quoting from *Commonwealth* v. *Trapp*, 396 Mass. 202, 206 (1985), *S.C.*, 423 Mass. 356, cert. denied, 519 U.S. 1045 (1996). At the outset, it is apparent that the evidence at issue here did not directly involve a prior bad act by this defendant.[4] There are a number of well-recognized exceptions to the basic rule, including instances where relevant evidence of prior bad acts is introduced to show "a common scheme or course of conduct, a pattern of operation, absence of accident or mistake, intent, or motive." *Commonwealth* v. *Barrett*, 418 Mass. 788, 794 (1994).

In its brief the Commonwealth contends that the evidence of

---

[4]Although this is not a case where the identity of the defendant is at issue, see *Commonwealth* v. *Garrey*, 436 Mass. 422, 433 (2002), it nonetheless may have been an appropriate case to impose a threshold requirement that "the Commonwealth must satisfy the judge that 'the jury [could] reasonably conclude that the act occurred and *that the defendant was the actor*'" (emphasis supplied). *Commonwealth* v. *Leonard*, 428 Mass. 782, 785 (1999), quoting from *Huddleston* v. *United States*, 485 U.S. 681, 689 (1988).

the prior episode involving Ritchie was relevant to the demonstration of "a common scheme involving the use of 'extras.' " The Commonwealth further argues that this evidence of events in 1998 helped to establish the defendant's involvement in keeping a house of ill fame in 1999 and was therefore highly probative of the issues in the case at bar. We disagree.

The testimony concerning what transpired in 1998 between Ritchie and Colleen focused attention on an incident not directly related to the matter at bar. Although the Commonwealth argues that the evidence was relevant to show the defendant's involvement in the activities at 238 Broadway, the evidence added little to the proof of the central issue in the case — the defendant's relationship to the illicit activity occurring on the premises in August of 1999. The "prior bad act" was not committed by the defendant or in the presence of the defendant and does not appear on this record to have a unique identifying connection with the separate events that gave rise to the instant case.

There is also an attempt to justify the introduction of this evidence on the basis that it demonstrates that the operations at 238 Broadway were not "fly-by-night" and could only have been overseen by an experienced person. This rationale seems highly speculative. Furthermore, the critical issue here was control of the operations by the defendant in 1999, not whether the defendant knew of any illicit activity at 238 Broadway in either 1998 or 1999.[5]

There was no legitimate basis for the introduction of the evidence as a prior bad act. No other basis on which the evidence could have been received has been argued. Even if the evidence could somehow accurately be characterized as relevant to the issues before the jury in this case, the evidence should not have been admitted because any possible probative value was outweighed by its probable unduly prejudicial impact. "If the probative increment achieved by introducing the incident was nugatory or nearly so, its prejudicial potential and probable

---

[5]As the defendant points out, there is no tenable argument that the January, 1998, raid could be considered as a part of a continuing offense with the 1999 occurrence, and the indictment did not so allege. See *Commonwealth* v. *Megna*, 59 Mass. App. Ct. 511, 513 (2003). See also *Commonwealth* v. *Patalano*, 254 Mass. 69, 73 (1925); *Commonwealth* v. *Stasiun*, 349 Mass. 38, 46-47 (1965).

impact were considerable." *Commonwealth* v. *Yelle*, 19 Mass.
App. Ct. 465, 471 (1985) See *Commonwealth* v. *Delong*, 60
Mass. App. Ct. 528, 534 (2004). The judge abused her discre-
tion in admitting this evidence. See *Commonwealth* v. *Flebotte*,
417 Mass. 348, 353 (1994). The error was palpable. *Com-
monwealth* v. *Yelle, supra* at 472.

Although the judge gave a limiting instruction to the jury, it
has been observed that "where the evidence subject to limita-
tions has an extremely high potential for unfair prejudice, we
have a duty to be skeptical as to the effectiveness of limiting
instructions." *Commonwealth* v. *DiMarzo*, 364 Mass. 669, 681
(1974) (Hennessey, J., concurring). See *Commonwealth* v.
*Redmond*, 370 Mass. 591, 597 (1976). Compare *Commonwealth*
v. *Binienda*, 20 Mass. App. Ct. 756, 759-760 (1985) (prejudicial
error to allow admission of complainant's prior consistent state-
ment made after "motive to falsify the testimony came into
existence"; limiting instructions did not cure prejudice because
"there is always present the danger that the jury will consider
the statement as affirmative evidence of its truthfulness").
Similarly, here, the danger is that the jury convicted on the
basis of the erroneously admitted evidence that was not cumula-
tive of any evidence legitimately before the jury in a case where
the evidence against the defendant was not overwhelming.

The jury in the case at bar could only be left with the impres-
sion that, because of the earlier episode, it was more likely than
not that the defendant was involved in illegal activities in 1999.
The prosecutor carefully set out the similarities between the
1998 and 1999 episodes. The evidence should not have been
admitted, and the limiting instructions did not cure the defect.

3. *Other matters.* The defendant argues that his motion to
suppress should have been granted. We reject his arguments and
conclude that the denial of his motion to suppress was correct.

Two evidentiary issues remain that will likely arise at retrial,
if any, of the case: whether the conversation testified to by the
officer in which Adrianne, who did not testify at trial, agreed to
provide "extras" was inadmissible hearsay. There is no merit to
the defendant's argument. The subject of the conversation was
admissible under an established principle that treats such state-
ments as nonhearsay. In *Commonwealth* v. *Kimball*, 7 Gray 328

(1856), the Supreme Judicial Court held that it was proper to admit the substance of conversations with prostitutes at an alleged house of ill fame because the substance of the conversation was "direct and pertinent evidence of the character of the house." *Id.* at 330. The same principle was articulated in *Commonwealth* v. *Bagdasarian*, 257 Mass. 248, 249 (1926). See *Commonwealth* v. *Washington*, 39 Mass. App. Ct. 195, 200 (1995); Liacos, Brodin, & Avery, Massachusetts Evidence § 8.2.3 (7th ed. 1999) ("It should be noted that in such cases there is a patent absence of motive to falsify on the part of the declarant and that there is a large volume of independent items of evidence that can be consistent with one another only if the hypothesis is true"). Contrast *Commonwealth* v. *Lopera*, 42 Mass. App. Ct. 133, 139 (1997) (statement made by prostitute to individual whom she knew to be police officer does not come within principle because there was motivation to falsify).

The defendant also contends that the testimony concerning the "Old English Health Club," an establishment that the Cambridge police had investigated previously, should not have been admitted. Our reading of the transcript reveals that the testimony concerning the "Old English Health Cub" was brought out on redirect examination after defense counsel's cross-examination of the police officer about his interaction and conversation with "Adrianne." The evidence was not offered for the truth of whether the club previously had been the subject of police attention. Rather, it was offered for the limited purpose of placing Adrianne's conversation with the officer in context, and the jury were so instructed.

The defendant also contends that several jury instructions were erroneous. We reject his arguments on the instructions, but do comment briefly on two of the challenged instructions for the purposes of clarification in the event of a retrial.

On the authority of *Commonwealth* v. *Smith*, 431 Mass. 417, 422-423 (2000), the Commonwealth concedes that the term "sexual intercourse," as used in G. L. c. 272, § 6, only encompasses penile-vaginal penetration. The judge here gave a much broader definition, specifically: "[T]he term, 'sexual intercourse[,]' describes a variety of sexual conduct, including natural and unnatural sex, unnatural and lascivious acts or engag-

ing in prostitution." When the term "sexual intercourse" is used in G. L. c. 272, the definition is much narrower than the one that was given. There was no objection to the instruction that was given. In the event of a retrial, the jury should be correctly instructed.

The defendant also asserts that the instruction setting forth the definition of the keeping of a house of ill fame was erroneous. The statute at issue, G. L. c. 272, § 24, defines the offense as follows: "Whoever keeps a house of ill fame . . . shall be punished by imprisonment for not more than two years." The indictment added the language "to the common nuisance of all," and the judge, on the request of the Commonwealth, added the element of nuisance to his definition of the offense. It appears from the plain language of the statute, and the Commonwealth now argues, that this additional element was not required. However, what the instructions erroneously added, they also took away, because a further instruction provided that "[p]roof beyond a reasonable doubt, however, that the premises located at 238 Broadway were resorted to for prostitution is sufficient to prove this element [nuisance] without further proof that the premises were otherwise disorderly." There was no objection to the instruction, and there was, in any event, no prejudice to the defendant from the addition of the element of nuisance.

We find the defendant's remaining arguments either irrelevant in light of our decision in this case or lacking in merit, and we do not, therefore, separately address them.

*Judgments reversed.*

*Verdicts set aside.*