## COMMONWEALTH vs. DAVID MULLANE.

Middlesex. November 9, 2005. - January 9, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Prostitution. Practice, Criminal,* Assistance of counsel, Instructions to jury, Mistrial, Motion to suppress, Required finding, Warrant. *Probable Cause. Search and Seizure,* Probable cause, Warrant. *Evidence,* Hearsay, Joint venturer, Prior misconduct.

A criminal defendant's pretrial motions to suppress evidence seized pursuant to a warrant were properly denied, where the statement of the named informant (upon which the application for the search warrant was based) had sufficient indicia of reliability to provide probable cause to issue the search warrant, and where the warrant, which was sufficient, was properly executed by police officers. [705-708]

At the trial of indictments charging the defendant with owning a place for unlawful sexual intercourse and keeping a house of ill fame, there was no error in the judge's admission, over the defendant's objection, of evidence regarding an earlier investigation of the relevant premises, where the judge issued a limiting instruction to the jury stating that the evidence could only be relevant to the defendant's state of mind, his knowledge of the alleged prostitution at the premises, or his pattern or method of operation of the premises [708-710]; likewise, there was no error in the admission in evidence of extrajudicial statements between a police detective and one of the "massage therapists" at the relevant premises, where such statements did not constitute hearsay [710-711].

The judge in a criminal action properly denied the defendant's motion for a mistrial based on the admission in evidence of certain testimony, where any prejudice against the defendant was remedied by the judge's curative instruction to the jury. [711-712]

A criminal defendant's claim of ineffective assistance of counsel lacked merit, as none of the challenged tactics was manifestly unreasonable. [712-713]

A Superior Court judge did not err in denying a criminal defendant's request for a required finding of not guilty on charges of owning a place for unlawful sexual intercourse under G. L. c. 272, § 6 [713-715], and keeping a house of ill fame under G. L. c. 272, § 24 [715-716], where a rational trier of fact could conclude, inter alia, that the defendant knew precisely the illicit sexual activity occurring at the subject premises.

At the trial of indictments charging the defendant with owning a place for unlawful sexual intercourse and keeping a house of ill fame, the judge's instruction on joint venture was proper [716-717], and his instruction setting forth the definition of a keeping a house of ill fame did not create a substantial risk of a miscarriage of justice [718]; moreover, while his

instruction concerning the definition of sexual intercourse was erroneous, it did not prejudice the defendant [717-718].

Nothing in the record of the trial of indictments charging the defendant with owning a place for unlawful sexual intercourse and keeping a house of ill fame, standing alone or in conjunction with other evidence, supported a conclusion that a substantial risk of a miscarriage of justice occurred. [719]

INDICTMENTS found and returned in the Superior Court Department on June 29, 2000.

A pretrial motion to suppress evidence was heard by *Sandra L. Hamlin*, J., and the cases were tried before her.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*David W. Cunis*, Assistant District Attorney, for the Commonwealth.

*George Hassett* for the defendant.

IRELAND, J. A Middlesex County jury convicted the defendant, David Mullane, of owning, or assisting in the management or control of, a place for unlawful sexual intercourse, G. L. c. 272, § 6; and keeping a house of ill fame, G. L. c. 272, § 24. The Appeals Court reversed the defendant's convictions. See *Commonwealth* v. *Mullane*, 63 Mass. App. Ct. 317 (2005). We granted the Commonwealth's application for further appellate review. The defendant raised eight issues on appeal, including improper denial of his motions to suppress, various errors at trial, ineffective assistance of counsel, and improper denial of his motions for required findings of not guilty. Because we find no ground to reverse, we affirm the defendant's convictions.

*Facts.* We recite the facts, reserving certain details for our discussion of the issues. In 1973 and 1982, the defendant purchased two adjacent buildings at 238 Broadway and 163 Harvard Street in Cambridge (238 Broadway) that were later connected by internal bridges at the top three levels. Several of the defendant's businesses were located at 238 Broadway, including the Oasis Group, consisting of chiropractic care and massage therapy; the Broadway Institute of Massage Therapy (school); and, at one point, the Broadway Health Club.

The first investigation of 238 Broadway was in January of

1998, when the Cambridge police department's vice-narcotics unit investigated the Broadway Health Club for prostitution. The Broadway Health Club was shut down immediately after the January, 1998, investigation and execution of a search warrant.

On February 9, 1999, the defendant transferred ownership of the school to his son, Patrick, and his daughter, Katherine. The defendant, as owner of 238 Broadway, then executed a written lease with Katherine permitting her use of the premises for the school. The only registered business at 238 Broadway was the school; however, Oasis Group also was being operated out of the same location, separated from the school by a door. Some students attending the school also worked in the Oasis Group.

In August of 1999, the Cambridge police department commenced another investigation of prostitution at 238 Broadway. On August 27, 1999, based on their observations and an informant's tip, the police obtained and executed a search warrant for the school and the Oasis Group.

Detective Thomas Ahern, who participated in the August, 1999, raid, testified that he entered 238 Broadway shortly after noon. He carried a pager that was to sound about fifteen to twenty minutes after he entered the building to alert him that a team of approximately fifteen police officers was commencing the execution of the warrant. The detective approached the front desk, asked for a half-hour massage, paid, and was then immediately led by a woman named "Adrianne," who was later identified as Lisa Ulwick, to a room containing a massage table.

Once the detective had disrobed and lay face down on the massage table, he and Adrianne engaged in casual conversation. Adrianne asked the detective if he had ever had a massage. The detective said that he had. Adrianne then asked the detective if he was a police officer, to which he replied no. The detective then asked what he "could get." Adrianne stated that he could get "anything" he wanted. After some discussion about price, Ahern then told Adrianne that he had seventy dollars, to which Adrianne said "that would be fine," and told him he could roll over on his back any time he wanted.

The detective became apprehensive at this point, because only about five minutes had passed since he had entered the

building. He rolled over, and Adrianne, then completely nude, began manually to stimulate Ahern's genitals. He said he needed to use the bathroom, where he stalled for time. Later, when he returned to the massage room, Adrianne asked him if he wanted her to finish. At that point, the beeper sounded, and the officer leading the team executing the warrant knocked on the exterior door of the building and announced the police team's entry into the premises.

Based on their statements and the evidence seized in the raid, Katherine and Patrick Mullane were sentenced to probation for keeping a house of ill fame. They denied that their father had any involvement in the businesses. However, on June 29, 2000, a grand jury returned indictments charging the defendant, inter alia, with the crimes of which he was convicted.

*Discussion.* 1. *Motions to suppress.* In two separate motions, the defendant moved to suppress the evidence seized at the time of the execution of the search warrant, first, on the ground that the warrant was not issued on sufficient probable cause; and second, on the ground that the warrant was improperly executed. The defendant argues that the denial of his motions was improper.

a. *Probable cause.* A valid search warrant must be based on a finding of probable cause. G. L. c. 276, § 1. *Commonwealth* v. *Upton*, 394 Mass. 363, 368 (1985). In this case, a judge issued the search warrant based on the affidavit of Detective Louis F. Cherubino, Jr., of the Cambridge police department. The affidavit included details from the sworn notarized statement of Linda Mullins, a former student-employee at the school and the Oasis Group, to the Department of Education; and various facts gleaned from the detective's interview with Mullins. The defendant does not challenge the basis of knowledge prong of the *Aguilar-Spinelli* test; however, he argues that the veracity prong was not satisfied by the affidavit.[1] *Aguilar* v. *Texas*, 378

---

[1] "Under the *Aguilar-Spinelli* standard, if an affidavit is based on information from an unknown informant, the magistrate must 'be informed of (1) some of the underlying circumstances from which the informant concluded that the contraband was where he claimed it was (the basis of knowledge test), and (2) some of the underlying circumstances from which the affiant concluded that the informant was 'credible' or his information 'reliable' (the

U.S. 108 (1964). *Spinelli* v. *United States*, 393 U.S. 410 (1969). We disagree. "Although police knowledge of the informant's 'identity' and 'whereabouts' would not be adequate standing alone to confirm the informant's reliability, it is a factor that weighs in favor of reliability." *Commonwealth* v. *Alfonso A.*, 438 Mass. 372, 376 (2003). Based on the level of detail given both in Mullins's sworn statement and at the subsequent meeting between her and Detectives Cherubino and Michael Maffei, we conclude that the informant was reliable, and therefore, her statements were sufficient to establish probable cause. See *id.* at 375 n.3 (where probable cause grounded in statements of named informant, strict requirements that govern analysis of anonymous informant's trustworthiness somewhat relaxed).

Mullins described at length and in detail the illicit sexual activity occurring at the massage school, which we need not recount here. Suffice it to say that Mullins claimed that she was expected to give various sexual favors to customers, including the "hand release," the manual manipulation of a man's penis to ejaculation, which was the technique Lisa Ulwick performed on Detective Ahern. Mullins also stated that it was common knowledge and openly discussed among the staff that the school was set up to provide a front for the illicit sexual activity occurring at the Oasis Group. The therapists from the Oasis Group, several of whom Mullins was able to describe in great detail, carried condoms on their person and discussed in front of each member of the Mullane family the sexual acts they performed and the lucrative payments they received for those acts. The defendant advised employees to be vigilant of whether the customer was an undercover police officer, in which case, the therapist was to give a "straight massage." As to her personal involvement in the enterprise, she stated that in a two-month period she had only received about fifteen minutes of actual

veracity test). *Aguilar* v. *Texas*, [378 U.S. 108, 114 (1964)]. If the informant's tip does not satisfy each aspect of the *Aguilar* test, other allegations in the affidavit that corroborate the information could support a finding of probable cause. *Spinelli* v. *United States*, [393 U.S. 410, 415 (1969)].' " *Commonwealth* v. *Upton*, 394 Mass. 363, 374-375 (1985), quoting *Commonwealth* v. *Upton*, 390 Mass. 562, 566 (1983), rev'd, 466 U.S. 727 (1984), *S.C.*, 394 Mass. 363 (1985).

instruction at the school; she had been called out of class on multiple occasions to service clients at the Oasis Group.

Finally, Mullins gave specific information regarding the internal operation of the premises. She noted that the defendant, who she described as a white male in his early sixties with gray hair, was usually present from 10 A.M. until noon or 1 P.M., and that he had an office adjacent to the front desk in the Oasis Group, where the therapists' schedules were kept. She also described the videotape surveillance system and the women's locker room. Based on this evidence, there was probable cause to issue the search warrant. The defendant's motion to suppress on this ground was properly denied.

b. *Improper execution of the warrant.* The defendant also argues that the execution of the warrant violated the "knock and announce" requirement, the requirement to show the warrant, and the requirement that the place to be searched must be described with particularity. These arguments have no merit. We take the following facts from the motion judge's findings of fact, which are fully supported in the record.

The police officers knocked and announced their presence on entering the lobby of the building. The officers approached the glass sliding window separating the lobby from the office area where Katherine and Patrick Mullane were sitting. The officers displayed the warrant through the window. Katherine and Patrick Mullane were unresponsive to Detective Cherubino's showing the warrant, and in fact, they appeared to be stalling. The officers, fearing the destruction of evidence, were forced to use a battering ram to enter an internal door in the building that led to the area where the massages were taking place. Based on these facts, the officers' actions were proper.

The warrant also was sufficient. Addendum B to the search warrant described with particularity the target of the search by street address, building number, location, and a physical description of the premises.[2] There was no ambiguity or

---

[2] The defendant claims that the Oasis Group address searched by the police on August 27, 1999, was really 163 Harvard Street, located at the rear of 238 Broadway. There were two buildings. The defendant had owned 32-40 Dickinson Street since 1973 and 163 Harvard Street since 1982. When the defendant

misdescription.[3] Moreover, the police were familiar with the premises, having obtained and executed the January, 1998, search warrant of the same premises and having conducted surveillance earlier in the week. There was no risk that the officers would search the wrong location or that they would be unable to locate the premises to be searched. This is all the law requires. See G. L. c. 276, § 2; *Commonwealth* v. *Treadwell*, 402 Mass. 355, 359 (1988); *Commonwealth* v. *Rugaber*, 369 Mass. 765, 768 (1976).

2. *Prior bad acts.* The defendant disputes the judge's admission, over his objection, of evidence regarding the 1998 investigation of 238 Broadway. The judge's decision to admit such evidence will not be disturbed absent a showing of palpable error. See *Commonwealth* v. *Gollman*, 436 Mass. 111, 115 (2002). There was no error.

"It is well settled that the prosecution may not introduce evidence that a defendant previously has misbehaved, indictably or not, for the purposes of showing his bad character or propensity to commit the crime charged, but such evidence may be admissible if relevant for some other purpose." *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986), and cases cited. "Such evidence can be highly prejudicial to the defendant, and therefore must be excluded unless it comes within one of

developed the three properties he owned, which were 32-40 Dickinson Street, 163 Harvard Street, and 238 Broadway (technically the parking lot area), he intentionally renamed the entire complex 238 Broadway, Building 1 and Building 2.

He did this for marketing reasons. He believed that Broadway was well known but that not many knew the location of Dickinson Street. Further, when the defendant purchased 163 Harvard Street in 1982, the Harvard Street side was associated with a high-crime area. Also, irrespective of the actual street address, clearly displayed on the outside of the building in full view of anyone entering on August 27, 1999, was a sign that read, "238 Broadway Building 2."

[3]The search warrant described the premises as follows: "238 Broadway, Building #2, Cambridge, Massachusetts is a wood and brick frame building that houses several business [*sic*]. The target of this affidavit is the 'Oasis Group' and the Broadway Institute of Massage Therapy which are located in the rear building, known as building #2, on the first level which is conspicuously marked with the number '238'. There are two signs on the exterior of the building, visible from the front of the building indicating the 'Fitness Training Center LLC Building 2.['] The targets of this search warrant are located on the first level of this building."

the permitted uses, such as to show a common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive." *Id.*, citing *Commonwealth* v. *Schoening*, 379 Mass. 234, 242 (1979). "The judge, within sound discretion, must consider whether the probative value of such evidence is outweighed by potential prejudice." *Commonwealth* v. *Gollman*, *supra* at 114, citing *Commonwealth* v. *Leonard*, 428 Mass. 782, 786 (1999).

Prior to the testimony regarding the 1999 raid, the Commonwealth moved to include the evidence of the January, 1998, incident. The judge granted the motion and the evidence was heard over the defendant's continuous objection. Both prior to the testimony concerning the 1998 investigation and at the close of the evidence, the judge issued a limiting instruction to the jury stating that the evidence could only be relevant to the defendant's state of mind, his knowledge of the alleged prostitution at 238 Broadway, or his pattern or method of operation of the premises.

The following reflects the testimony of Sergeant David Ritchie of the Malden police department drug unit, an undercover officer who participated in the 1998 investigation. The officer entered the Broadway Health Club, paid fifty dollars, and was led to a small room by a woman named Colleen. Colleen instructed the officer to go into the room and remove his clothes. She said she would be back in a few minutes. When Colleen returned, she and Sergeant Ritchie engaged in casual conversation; she asked the officer whether he had ever had a massage before. He replied that he had received a massage at the Danish Health Club in Kittery, Maine, a club that was apparently widely known as a prostitution front. Colleen then asked, "How much do they charge up there for extras?" The officer understood "extras" to mean sexual favors, and in response, he made up a large sum of money. Colleen replied that that was "rather expensive." Colleen then instructed Ritchie to turn over. As he turned on his back, Colleen asked, "How would you like to end your massage?" The two then discussed the price list for sexual favors, which included a "hand job," manual manipulation of the penis to ejaculation, and "oral sex." When Ritchie replied that he did not have enough money

with him, Colleen ended the massage saying, "You know, we work off of tips here, and you've had a massage before. You know what we're talking about."

This evidence was properly admitted. The defendant was the owner of 238 Broadway during the time of the 1998 investigation. Once the Broadway Health Club was shut down, another company owned by the defendant, the Oasis Group, took over the same area. Despite the fact that the defendant was no longer the named owner of the businesses at 238 Broadway at the time of the 1999 investigation, the evidence of the strikingly similar methods of operation of 238 Broadway throughout the course of both investigations was highly probative of the defendant's knowledge that illicit sexual activity was occurring at 238 Broadway.

In both incidents, virtually identical terminology and negotiation styles were used. The defendant may not claim that the incidents resulted from the isolated actions of two renegade employees. The pattern of operation, whereby sexual favors were negotiated for a fee, was simply too well organized and similar to be coincidental. Indeed, the prosecution introduced in evidence a memorandum seized in the 1999 raid advising therapists to contact the defendant directly if any massage session ended early. As the Commonwealth argued and the jury could infer, the defendant learned from the 1998 investigation that massages usually ended early when undercover police officers posed as clients. For these reasons, the limiting instruction was proper and the evidence was properly admitted as to the defendant's state of mind, his knowledge of the alleged prostitution at 238 Broadway, or his pattern or method of operation of the premises.

3. *Extrajudicial statements.* During Detective Ahern's interaction with Lisa Ulwick, they negotiated a fee for "extras" and referred to the "Olde English Health Club," an establishment the Cambridge police had previously investigated. The defendant argues that the contents of the conversation were improperly admitted. We disagree.

As to the first statement regarding the negotiations, the judge allowed the Commonwealth's motion in limine to admit the contents of Ulwick's conversation with Detective Ahern. There

was no error. The portion of the conversation regarding the negotiation was admissible under an established principle that such statements are nonhearsay. See *Commonwealth* v. *Kimball*, 7 Gray 328, 330 (1856) (proper to admit substance of conversations with prostitutes at alleged house of ill fame because substance of conversation "direct and pertinent evidence of the character of the house").

With respect to the reference to the "Olde English Club," we conclude that the statement was not offered for the truth of the matter, but rather for the limited purpose of giving context to Detective Ahern's conversation with Lisa Ulwick. The jury were so instructed.

4. *Motion for a mistrial.* The defendant argues that the trial judge erred by refusing to grant his motion for a mistrial after one of the Commonwealth's witnesses, the detective who led the officers executing the warrant, offered unsolicited testimony that the defendant contends was intentionally elicited and prejudicial.[4] We disagree. The decision whether to declare a mistrial is within the discretion of the trial judge. See *Commonwealth* v. *Kilburn*, 426 Mass. 31, 37 (1997). "Where a party seeks a mistrial in response to the jury's exposure to inadmissible evidence, the judge may 'correctly rel[y] on curative instructions as an adequate means to correct any error and to remedy any prejudice to the defendant.' " *Id.* at 37-38, quot-

---

[4]The testimony at issue was as follows:

THE PROSECUTOR: "Would you describe what happened when you went into the first massage room?"

THE WITNESS: "Upon entering, the door was closed. I entered and observed a male with his zipper to his pants down, standing, and a female standing beside him."

THE PROSECUTOR: "And how close was the female standing to him?"

THE WITNESS: "She was right next to him, shoulder to shoulder."

THE PROSECUTOR: "And can you describe for the jury what happened when you walked in and you saw the gentleman standing with his fly down and a woman standing next to him, shoulder to shoulder?"

THE WITNESS: "The male who was standing immediately sat down in a chair. The female immediately propped [*sic*] up onto the massage table and began demonstrating stretching techniques."

THE PROSECUTOR: "What did you do?"

THE WITNESS: "I immediately knew the female from a past investigation. I knew there was an active arrest warrant for her."

ing *Commonwealth* v. *Amirault*, 404 Mass. 221, 232 (1989). In this case, the judge's curative instruction immediately after the defendant's objection and sidebar conference was sufficient to remedy any prejudice against the defendant. See *Commonwealth* v. *Garrey*, 436 Mass. 422, 435 (2002). The motion for a mistrial was properly denied.

5. *Ineffective assistance of counsel.* The defendant claims that his counsel was ineffective in his representation of the defendant in (1) using terms prejudicial to the defendant throughout the trial; (2) not calling Lisa Ulwick as a witness; (3) negatively commenting on defense witnesses and crediting the Commonwealth's witnesses; and (4) conceding prostitution in his closing argument. In reviewing the defendant's claim of ineffective assistance, we must examine whether there has been "serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

As the Appeals Court noted and we agree, at trial there was no real dispute as to the illicit sexual activity occurring at the premises. See *Commonwealth* v. *Mullane*, 63 Mass. App. Ct. 317, 318 (2005). The defendant's principal defense was that he was not in control of the premises at 238 Broadway, but that his children, Katherine and Patrick, ran the businesses. The record shows that defense counsel's occasional negative references to two of the defense witnesses, Katherine and Patrick; positive reference to Sergeant Ritchie, the officer involved in the 1998 investigation of 238 Broadway; and general references to the illicit activity occurring at 238 Broadway were done strategically. After some of these references, defense counsel attempted to distance the defendant from the illegal activity, asking, "Where was David Mullane?" We conclude that counsel's decision to use this tactic was not manifestly unreasonable, and therefore, it fails to give rise to ineffective assistance of counsel. See *Commonwealth* v. *Sena*, 441 Mass. 822, 825-826 (2004) (court gives deference to counsel's tactical decisions unless "manifestly unreasonable when made").

Concerning defense counsel's failure to call Lisa Ulwick as a witness, the defendant argues that she was the "highest trump" card that should have been "played" by counsel because her alleged testimony would have contradicted the Commonwealth's position that prostitution was occurring at 238 Broadway. Ulwick was a prostitute who solicited a police officer for illicit sexual activity for a fee. Her behavior was the subject of the charges facing the defendant. The defendant has failed to show that Ulwick would not invoke her privilege under the Fifth Amendment to the United States Constitution not to testify. Nor has the defendant shown that Ulwick's testimony would have proved helpful to him, beyond his speculative assertion. Accordingly, his argument fails. See *Commonwealth* v. *Ortega*, 441 Mass. 170, 178 (2004) (ineffective assistance not established by showing that counsel could have called additional witnesses; defendant must show that witnesses' testimony would have been relevant or helpful).

Finally, our reading of the transcript reveals that defense counsel's reference to "sex for a fee" in his closing argument was in order to admonish the Cambridge detective for going too far by receiving a "hand release" from Lisa Ulwick. Indeed, the comment was a part of the defense's over-all strategy to distance the defendant from the criminal activity occurring at 238 Broadway, while also highlighting the police department's excesses during the investigation. Ultimately, defense counsel ended this recounting of the "hand release" received by Detective Ahern with, "Where was David Mullane?" We do not question counsel's strategy during his closing argument, and conclude that his representation of the defendant was not defective.

6. *Motions for required findings of not guilty.* The defendant moved unsuccessfully for a required finding of not guilty at the close of the Commonwealth's case, at the close of all of the evidence, and after the jury returned verdicts on two indictments. He argues that the Commonwealth failed to prove the elements of the two offenses with which he was charged; that the Commonwealth's case was weakened by the defendant's case; and that, therefore, the judge should have granted the defendant's motions for required findings of not guilty.

The " 'question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' (emphasis in original). *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979) . . . . Thus, to sustain the denial of a directed verdict, it is not enough for the appellate court to find that there was some record evidence, however slight, to support each essential element of the offense; it must find that there was enough evidence that could have satisfied a rational trier of fact of each such element beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979).

The defendant was convicted of owning, or assisting in the management or control of, a place for unlawful sexual intercourse and keeping a house of ill fame. We address each conviction, in turn.

a. *G. L. c. 272, § 6.* Conviction of owning, or assisting in the management or control of, a place for unlawful sexual intercourse requires the Commonwealth to show (1) that the defendant owned, managed, or assisted in the management or control of certain premises; (2) that a person was present on those premises for the purpose of unlawfully having sexual intercourse; (3) that the defendant induced or knowingly suffered the person's presence on the premises for that purpose; and (4) that the purpose of sexual intercourse was for financial gain. See G. L. c. 272, § 6. See also *Commonwealth* v. *Bucaulis*, 6 Mass. App. Ct. 59, cert. denied sub nom. *Bucuvalas* v. *Massachusetts*, 439 U.S. 827 (1978). The defendant argues that the Commonwealth proffered no evidence of sexual intercourse and that the Commonwealth failed to prove that the defendant "knowingly" suffered Lisa Ulwick's presence on the premises for the purpose of sexual intercourse. We disagree.

The statute does not require the Commonwealth to show that sexual intercourse took place on the premises.[5] The Commonwealth need only show that the "purpose" of the person's

---

[5]General Laws c. 272, § 6, states, in relevant part: "Whoever, being the owner of a place or having or assisting in the management or control thereof induces or knowingly suffers a person to resort to or be in or upon such place, for the purpose of unlawfully having sexual intercourse for money or other financial gain, shall be punished by imprisonment in the state prison for a period of five years and a five thousand dollar fine."

presence on the premises was unlawfully to have sexual intercourse. In this case, the Commonwealth, through Detective Ahern's testimony, demonstrated that Lisa Ulwick was willing to give the detective "anything" he wanted with respect to paid "extras." Based on the amount of money the detective had in his possession — seventy dollars — he was entitled to a "hand release," which Ulwick then began to provide while completely nude. The Commonwealth sufficiently proved that the "purpose" of Ulwick's presence was to provide customers "anything" they wanted, including, presumably, sexual intercourse, as long as the customers had enough money. See *Commonwealth v. Bucaulis, supra* at 63 ("open for the jury to determine as a matter of fact that [female entertainer] was available for sexual intercourse with customers who desired such service" where only fellatio actually was performed).

As to the defendant "knowingly" suffering Ulwick on the premises for the purpose of sexual intercourse, the Commonwealth provided ample evidence on this element. Among other things, the Commonwealth showed that the defendant initially established the school; he paid the utility bills; he contacted advertisers; in 1999, his voice was on the outgoing marketing messages to potential clients; there was a similar incident involving "extras" and a massage therapist in 1998; in 1999, an administrative memorandum was seized stating that the defendant was to be notified if any massage session ended early; the same memorandum warned therapists not to discuss "anything except massage technique when speaking of a massage session"; and perhaps most damning, the defendant hired and fired massage therapists for the Oasis Group. A rational trier of fact could infer that the defendant knew precisely the illicit sexual activity occurring at 238 Broadway. As to G. L. c. 272, § 6, the judge did not err by denying the defendant's motions for required findings of not guilty.

b. *G. L. c. 272, § 24.* Conviction for keeping a house of ill fame requires the Commonwealth to show (1) that the defendant owned, managed, or maintained the premises; and (2) that the premises were resorted to for sexual activity for

hire. See G. L. c. 272, § 24.[6] For the reasons discussed *supra*, the Commonwealth provided sufficient evidence regarding the defendant's knowledge and control of the illicit sexual activity occurring on the premises.[7]

7. *Jury instructions*. a. *Joint venture*. Prior to discussing the charges in the indictment, the judge provided a general instruction to the jury regarding the elements of joint venture. The joint venture instruction was meant to apply to each of the charges before the jury. The judge essentially instructed the jury that a defendant may be convicted as a joint participant in a crime if he aids in the commission of the crime, or is an accessory before the fact by counselling, hiring, or otherwise procuring the crime to be committed. See *Commonwealth* v. *Ortiz*, 424 Mass. 853, 856 (1997), quoting G. L. c. 274, § 2. Physical presence under this theory of joint venture is not required, but there must be an "association with the criminal venture and any significant participation in it." *Commonwealth* v. *Ortiz, supra*, quoting *Commonwealth* v. *Raposo*, 413 Mass. 182, 185 (1992). The defendant argues that the judge erroneously provided this joint venture instruction to the jury because the facts of this case do not support a conviction on a theory of joint venture. We review the judge's instruction for prejudicial error, and conclude that the joint venture instruction was proper. See *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998).

As to G. L. c. 272, § 6 (owning, or assisting in the management or control of, a place for unlawful sexual intercourse), the evidence presented at trial sufficiently illustrated the defendant's association with the illicit sexual activity occurring at 238 Broadway, both directly and indirectly, through his children. Based on the evidence, a rational trier of fact could have found that the defendant orchestrated an elaborate front for prostitution in which his children were gainfully employed. The facts

---

[6]General Laws c. 272, § 24, states: "Whoever keeps a house of ill fame which is resorted to for prostitution or lewdness shall be punished by imprisonment for not more than two years."

[7]The Commonwealth's case as to proof of these elements did not thereafter deteriorate.

sufficiently supported the joint venture theory with respect to G. L. c. 272, § 6.[8]

With respect to G. L. c. 272, § 24 (keeping a house of ill fame), the joint venture instruction also was proper. See *Commonwealth* v. *Ahearn*, 160 Mass. 300 (1894) (where jury may draw inference of defendant's participation in misdemeanor, defendant charged directly as principal). The Commonwealth ably demonstrated that the defendant owned, managed, or maintained the premises where prostitution was taking place. Based on this evidence, the jury could have found the defendant guilty of G. L. c. 272, § 24, keeping a house of ill fame as a principal, or that he jointly participated in the keeping of such a house. There was no error.

b. *Definition of sexual intercourse.* The defendant argues, and the Commonwealth concedes, that the judge gave an erroneous instruction on the definition of sexual intercourse. We agree, but conclude that the defendant was not prejudiced by the error.

The term "sexual intercourse," as used in G. L. c. 272, § 6, encompasses only penile-vaginal penetration. See *Commonwealth* v. *Smith*, 431 Mass. 417, 422-423 (2000). The judge gave a much broader definition: "[T]he term, 'sexual intercourse' describes a variety of sexual conduct, including natural and unnatural sex, unnatural and lascivious acts or engaging in prostitution."[9]

The erroneous instruction was not prejudicial, because in this

---

[8]As our discussion, *supra*, illustrates, the jury also may have found the defendant guilty as a principal.

[9]The Appeals Court apparently accepted the Commonwealth's argument that the defendant's objection to the definition of sexual intercourse was not properly preserved. See *Commonwealth* v. *Mullane*, 63 Mass. App. Ct. 317, 326 (2005). We do not agree. At trial, the defendant objected to the breadth of the judge's definition of sexual intercourse, and in his brief, citing *Commonwealth* v. *Bucaulis*, 6 Mass. App. Ct. 59, cert. denied sub nom. *Bucuvalas* v. *Massachusetts*, 439 U.S. 827 (1978), he argues that sexual intercourse should be narrowly defined as the "penetration or intrusion of one's body into another's body." The defendant's objection on these grounds is sufficient to preserve his rights on appeal. It is irrelevant that we now find the definition of sexual intercourse given by the judge erroneous on an even more narrow ground than the one suggested by the defendant. Cf. *Commonwealth* v. *Fowler*, 431 Mass. 30, 40-41 (2000) (defendant's objections regarding comments on defendant's right to remain silent were not preserved on appeal where no ground was offered at trial for one objection and where prosecutor's injection

case the Commonwealth had to prove that the defendant induced or knowingly suffered a person to be on his premises for the *purpose* of sexual intercourse. See G. L. c. 272, § 6. As noted *supra*, the Commonwealth was not required to prove that "sexual intercourse" actually took place on the premises. The Commonwealth's obligation under the statute was to illustrate that the defendant knew that the purpose of Lisa Ulwick's presence on the premises was to engage in sexual intercourse. Ulwick, while standing in the nude, offered Detective Ahern "anything" he wanted. The jury could properly infer that "anything" included sexual intercourse. See *Commonwealth* v. *Bucaulis, supra* at 63.[10] The fact that the detective actually received a "hand release" rather than engaged in penile-vaginal intercourse does not detract from Ulwick's underlying purpose to do "anything" a paying client could afford. The defendant was not prejudiced by the erroneous instruction.

c. *The ill fame instruction.* The defendant also asserts that the instruction setting forth the definition of keeping a house of ill fame was erroneous. The statute at issue, G. L. c. 272, § 24, defines the offense as follows: "Whoever keeps a house of ill fame . . . shall be punished by imprisonment for not more than two years." The indictment includes the language, "to the common nuisance of all," and the judge, at the request of the Commonwealth, added the element of nuisance to the jury instruction. This additional element was not required. A further instruction stated as much, and provided that proof beyond a reasonable doubt of keeping a house of ill fame "is sufficient to prove [nuisance] without further proof that the premises were otherwise disorderly." The defendant did not object to this instruction, and we find no substantial risk of a miscarriage of justice.[11] See *Commonwealth* v. *Alphas*, 430 Mass. 8, 13 (1999).

---

of personal opinion into closing was offered as ground for another objection).

[10]*Commonwealth* v. *Smith*, 431 Mass. 417 (2000), overturns the *Bucaulis* case to the extent that it modifies the Appeals Court's inclusion of fellatio in the definition of sexual intercourse under G. L. c. 272, § 6. See *Commonwealth* v. *Bucaulis, supra* at 66 ("The term 'sexual intercourse' has commonly been employed to describe a variety of sexual conduct, including the act of fellatio"). See also *Commonwealth* v. *Smith, supra* at 427 n.2 (Ireland, J., dissenting).

[11]We cannot see how requiring the Commonwealth to prove an additional element in its case would harm the defendant.

8. *Substantial likelihood of a miscarriage of justice.* Citing *Commonwealth* v. *Cancel*, 394 Mass. 567 (1985), the defendant argues that the "combination of judicial errors, prosecutorial misconduct and ineffective assistance of counsel created a substantial likelihood of a miscarriage of justice." We find this final argument wholly lacking in merit. The only error we noted, the erroneous jury instruction on the definition of sexual intercourse, was not prejudicial. Nothing in the record, standing alone or in conjunction with other evidence, would support a conclusion that a substantial risk of a miscarriage of justice has occurred.

*Judgments affirmed.*