COMMONWEALTH *vs.* OMAR L. DEJESUS.

No. 06-P-1133.

Hampden. January 19, 2007. - September 12, 2007.

Present: GELINAS, ARMSTRONG, & BERRY, JJ.

*Firearms. Search and Seizure,* Warrant, Protective sweep. *Constitutional Law,* Search and seizure.

A District Court judge erred in allowing the criminal defendant's motion to suppress evidence of a disassembled handgun that police officers — who were executing a warrant for the defendant's arrest on armed carjacking charges — found during a protective sweep of a certain house, in plain view in an open toolbox in the cellar of that building, where the officers had an objective concern for their safety based on the violent crime for which the defendant's arrest warrant had been issued, as well as his history of violent felonies and firearm possession charges. [116-120]

COMPLAINT received and sworn to in the Westfield Division of the District Court Department on March 23, 2006.

A pretrial motion to suppress evidence was heard by *Paul M. Vrabel,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Roderick L. Ireland,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

*Katherine E. McMahon,* Assistant District Attorney, for the Commonwealth.

*Jaclyn R. Greenhalgh* for the defendant.

ARMSTRONG, J. The defendant, charged with unlawful possession of a firearm, moved successfully for suppression of the dismantled handgun on which the charge was based, and a single justice of the Supreme Judicial Court allowed the Commonwealth's petition to prosecute this interlocutory appeal. See G. L. c. 278, § 28E; Mass.R.Crim.P. 15(a)(2), as appearing in 422 Mass. 1501 (1996).

The District Court judge, feeling constrained by appellate decisions (*Maryland* v. *Buie*, 494 U.S. 325 [1990], and *Commonwealth* v. *Nova*, 50 Mass. App. Ct. 633 [2000]), suppressed the gun as the product of an unlawful protective sweep despite also finding that the police acted reasonably "in good faith and with high professionalism."[1]

The circumstances, as found by the judge in careful and detailed findings, were these. Troopers James Devlin and Michael Sullivan, members of the State police violent fugitive apprehension section, received information from Springfield police officers that the defendant could be found at a particular apartment in Westfield. The police had a warrant for the defendant's arrest on a charge of armed carjacking. Troopers Devlin and Sullivan did not know the details of that offense beyond the charge itself, but did know that the defendant had a record of violent felonies including firearm possession charges. Following the section's usual procedure when executing an arrest warrant for a violent felon, the officers assembled a large force (eight officers, apparently) in anticipation of resistance — possibly armed. With officers posted to guard possible means of exit, three troopers, including Devlin and Sullivan, went to the front door of the apartment and knocked and announced. The defendant himself opened the door. Trooper Sullivan asked if the police could enter (the defendant said yes) and explained the purpose of the visit, to arrest the defendant under authority of the warrant. They placed handcuffs on the defendant; then, following the usual protocol of the violent fugitive apprehension section, the officers fanned out to discover who else was in the unit.[2] Two women sat in the living room, one of whom was wanted on a charge of assault and

---

[1]The judge went on: "There is much to be said for acceptance of a 'bright line' rule that would permit police to enter any area of an apartment or dwelling when executing an arrest warrant for a violent felony without having first to justify their actions by a showing of reasonable suspicion. '[O]fficers facing the life threatening situation of arresting a violent criminal in the home should not be forced to pause and ponder the legal subtleties associated with a quantum of proof analysis.' LaFave, [Search & Seizure, § 6.4(c),] at 381 [4th ed. 2004 & 2006 Supp.]. However, this court is obligated to follow the rulings of the Supreme Court and our [S]tate appellate courts."

[2]According to Trooper Sullivan, "We always clear the residence. When there's other individuals we always identify them . . . . Number one, we would have to make sure that they belong there, whether or not who resides

battery with a dangerous weapon. The two women said that the defendant's father was in an upstairs room and that there was someone in the cellar, where the officers could hear music playing. One officer went upstairs, and two went to the cellar, where they found a man listening to music. In plain view in an open toolbox in the cellar, the officers saw the disassembled handgun. The defendant acknowledged that he had owned the gun for several years, saying he found it.

The defendant conceded in the trial court that the police entered the house lawfully. His contention is that the protective sweep of the house exceeded constitutional limits. The judge, in his conclusion of fact, did not question the good faith of the officers who conducted the protective sweep. In particular, he found that this was the standard practice of the violent fugitive apprehension section when effecting an in-house arrest, that the practice had been adopted for the safety of the officers and others in the dwelling and not as a pretext for a search for evidence. Nevertheless, the incursion into the cellar could not be squared with the governing case law, the judge concluded, because to "look [beyond] closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched[,] . . . there must be articulable facts which, taken together with reasonable inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland* v. *Buie*, 494 U.S. at 334. To the same effect, see Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 12-3[a][3][ii] (2006).

Concluding that the police had failed to show articulable facts warranting a belief that there were one or more individuals in the dwelling posing a danger to the police or others present, the judge, with misgivings, ordered suppression of the handgun. He cited as authority *Maryland* v. *Buie*, and a decision of this court, *Commonwealth* v. *Nova*, 50 Mass. App. Ct. 633, 635 (2000). The *Nova* decision, in turn, relied on an earlier decision of this court, *Commonwealth* v. *Dubois*, 44 Mass. App. Ct. 294, 296 (1998).

there, and also for our safety and protection. We also check any resident that's in the house for warrants."

Both decisions relied on the quoted language from *Maryland* v. *Buie*, but both are distinguishable from the defendant's case.

The *Dubois* decision involved officers attempting to execute a search warrant of an apartment of a woman named Corrine Skelly. They knocked but received no answer and heard no motion inside. On leaving, they spotted Skelly and her male companion, Charles Hallal, emerging from a garage across the street. Hallal turned and ran back into the garage, dropping a bag of cocaine as he fled. The police rushed him and took him into custody a few steps into the garage. From the adjoining garage, separated from the Skelly-Hallal garage by a floor to ceiling partition, but with an open door between them, the police heard a voice calling, "Charlie, is that you?" The officers entered the second bay through the open door and saw the defendant Dubois, lying on a bed in a parked camper, surrounded by accouterments of drug trafficking. *Dubois, supra* at 295. After an extended dictum questioning whether the entry into the second bay could be justified as a protective sweep under *Maryland* v. *Buie*, given evidence that the police had no fear whatever for their safety, our decision recites that "[t]he Commonwealth, on appeal, abandons the protective sweep exception which it argued below and, instead, urges a different rationale . . . : [that the police] . . . could enter the garage in pursuit of Hallal and, when they heard the defendant calling to Hallal, they had fresh probable cause to believe that the defendant was engaged in the distribution of cocaine and that any delay in confronting him would result in loss of evidence." *Dubois, supra* at 297. Our decision's holding rejected that theory as "too speculative to have probative value." *Id.* at 298.[3]

In the *Nova* decision, the officers arrived at the defendant's apartment with an arrest warrant (the defendant had fled from a courtroom where he was on trial for an unrelated matter), ascended the stairs, knocked and announced their purpose, but received no answer or other sound of any one within. They went down to the first floor and were talking with neighbors when they heard footsteps, apparently of one person only, ascending the stairs and

---

[3]Reflecting on the dictum in *Dubois*, we note that there was not only no evidence in that case that fear for safety was implicated in the sweep, but also no evidence whatever of the use of firearms or other weapons in the previous criminal activities of Skelly, Hallal, or the defendant Dubois.

entering the apartment. They went back up, knocked and announced their purpose, and immediately heard the person within — the defendant Nova — racing to the rear door to flee. They broke down the front door, gave chase, arrested the defendant as he was leaving, and departed with him. Five minutes later, police reentered the now open apartment and conducted a search they attempted to justify as a protective sweep under the authority of *Maryland* v. *Buie*. We reversed the denial of the motion to suppress drugs and paraphernalia found as a result of the second entry. The *Maryland* v. *Buie* rationale was inapplicable for two reasons: first, the police in effect knew there was no one else hiding in the apartment, having been through once before chasing the defendant; and, second, the arrest and removal of the defendant from the scene had already been completed. *Nova, supra* at 633-636.

Far more pertinent to the facts of this case are such decisions as *Commonwealth* v. *Walker*, 370 Mass. 548, 556-558, cert. denied, 429 U.S. 943 (1976) (police executing arrest warrant for defendant for murder and armed robbery and who had observed someone peering out a window before they entered the apartment and who knew there were several occupants inside, could properly conduct a protective sweep for other persons); *Commonwealth* v. *Bowden*, 379 Mass. 472, 478 (1980) ("judge found that a security check was reasonably believed necessary by the police to ensure their personal safety"); *Commonwealth* v. *Lewin (No. 1)*, 407 Mass. 617, 621-622 (1990) ("In a murder case, the police 'may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises.' *Mincey* v. *Arizona*, [437 U.S. 385, 392 (1978)] . . . . The scope of such a search, sometimes characterized as a protective sweep, is limited to a cursory inspection for victims or suspects").

It is clear in this case from the judge's findings that the violent fugitive apprehension section of the State police employed the protective sweep protocol based on the character of the fugitive they were called on to apprehend. Trooper Sullivan, an officer of twenty-three years with the State police department, in recent years had the apprehension of violent fugitives as his sole activity within the department. Asked to explain why the section used protective sweeps, he testified:

"*A.* Well, officers' safety is our number one issue. Everyone is going to come to work and everyone is going to go home. When we go into an apartment, we have to clear the apartment for people, for everyone's safety. Someone could sneak up from behind us with a gun. They could jump on top of us. People are hiding all the time in closets, underneath beds, in between bed frames and mattresses, just for everyone's safety, the entire apartment is going to be clear. . . .

"*Q.* And in your five years on this fugitive [apprehension unit], how many times have you had occasion or individuals at — hidden or come out from places when you were doing the sweep?

"*A.* Numerous times, well over hundreds."

We do not read *Maryland* v. *Buie* to require necessarily that the findings of "articulable facts" justifying a protective sweep be separate from the violence implicit in the crime for which the defendant is sought and the violence implicit in his criminal history. A violent criminal record can, in our view, constitute the separate basis called for by *Maryland* v. *Buie* and result in a commonsense application of the overarching constitutional principle of reasonableness. In the United States Supreme Court's decision Justice White, speaking for the majority, stated:

"The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. A *Terry* [*Terry* v. *Ohio*, 392 U.S. 1 (1968)] or *Long* [*Michigan* v. *Long*, 463 U.S. 1032 (1983)] frisk occurs before a police-citizen confrontation has escalated to the point of arrest. A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings."

*Maryland* v. *Buie*, 494 U.S. at 333.

The "articulable facts" that justified the sweep are, in our view, found in the violent crime (armed carjacking) for which the defendant's arrest warrant was issued and in his record of violent felonies and firearm possession charges. There is nothing at variance with this conclusion in the *Dubois* case, which involved no suggestion of criminal violence, or in the *Nova* case, where the arrest had been completed and the defendant removed from the scene before the police returned to the apartment and executed a protective sweep. Here the police had an objective concern for their safety — a concern rooted in the articulable facts of the defendant's criminal history. The defendant's motion to suppress the evidence of the handgun found in plain view in the basement should have been denied.

*Order allowing motion to suppress reversed.*