Commonwealth v. Matos.

COMMONWEALTH VS. ANDRE MA⸱ OS.

No. 08-P-2126.

Hampden. February 5, 2010. - October 21, 201(

Present: RAPOZA, C.J., McHUGH, & GRAHAM, JJ.

Controlled Substances. Firearms. Search and Seizure, Warrant, Protective sweep, Plain view. Constitutional Law, Search and sei ure.

A Superior Court judge erred in allowing a criminal d( endant's motion to suppress evidence seized during a search of a home :hat was conducted pursuant to a warrant, which had been obtained on th basis of police officers' observations, made earlier while they were co1 lucting a protective sweep in the course of executing a warrant for the c fendant's arrest, of contraband in plain view (on a different floor of the h me than the one on which the defendant was arrested), where knowledg of the defendant's prior arrests for firearms offenses provided the neces iry specific and articulable facts to show that the protective sweep was arranted. [159-160] GRAHAM, J., dissenting.

INDICTMENT found and returned in the Superi r Court Department on March 15, 2007.

A pretrial motion to suppress evidence was eard by Tina S. Page, J.

An application for leave to prosecute an int( locutory appeal was allowed by Robert J. Cordy, J., in the S1preme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

James R. Goodhines, Assistant District A torney, for the Commonwealth.

Cynthia Vincent Thomas for the defendant.

McHUGH, J. The defendant, Andre Matos, w1 1s charged with numerous offenses involving firearms possessic 1, possession of cocaine and marijuana with intent to distribut , and receiving stolen property. A judge of the Superior Court all( wed the defendant's motion to suppress, and the Commonwei .th brought this interlocutory appeal. We reverse.

*Background.* "We summarize the pertinent facts from the judge's findings on the motion to suppress, supplemented where appropriate by uncontroverted testimony from the suppression hearing." *Commonwealth* v. *Washington*, 449 Mass. 476, 477 (2007).

On January 23, 2007, just before 6 A.M., approximately thirteen members of the Springfield police department's tactical response team went to 165 Princeton Street, a two and one-half story single-family house, to execute a warrant for the defendant's arrest on drug distribution charges. Team members were wearing camouflage uniforms clearly indicating that they were police, and the officers were armed. Lieutenant Rupert Daniel, the team leader, was familiar with the defendant and knew that he had a prior arrest for a firearms offense. Other members of the team were also informed of the defendant's prior firearms offense before executing the warrant. On the basis of this information, the team members planned to fan out to all floors of the house upon their entry to determine whether there was a threat, in accordance with tactical response team protocol. Daniel had also determined that three people, the defendant, his mother (mother), and his mother's seven year old niece (niece), lived in the house.[1]

Upon arrival at the house, Daniel knocked on the door, and the mother answered.[2] Daniel asked her where the defendant was, and she pointed upstairs. Daniel saw the defendant, who was at the top of the stairs on the second floor, run into a bedroom and close the door. Daniel and about five other officers ran up the stairs, kicked open a door, and secured the defendant. The other team members immediately and simultaneously separated to conduct a protective sweep. As Daniel and his group were moving up the stairs to secure the defendant, two officers went

---

[1] Our dissenting colleague says that before entering the house, Daniel "had information" that the defendant, his mother, and her niece were the only "occupants" of the house. The record and the judge's findings, however, show that Daniel knew who "lived" in the house, see *post* at note 1, but disclose nothing about the critical issue of what Daniel knew or did not know about who was actually in the house at the time he and the other team members were executing the arrest warrant.

[2] Two of the officers testified that upon entering the house they detected a strong odor of marijuana, but Daniel testified that he detected no such odor, and the judge credited Daniel's testimony.

into the basement and, finding no one, quickly came back upstairs. Two other officers went into the second-floor bedroom where the niece was sleeping.[3] They found no one else. Another group of officers swept by Daniel and proceeded to the third floor, an attic area containing a small bedroom. In that room, in plain view, one of the officers saw a bag of marijuana, what appeared to be "crack" cocaine, and other drug paraphernalia, together with a black safe on the floor.

After speaking with Daniel, Officers Wadleger and Mazza, part of the group that had gone to the third floor, returned to the police station to prepare an application for a search warrant based on their observations in the attic bedroom. The officers returned with the warrant at about 8:20 A.M. In the ensuing search of the third floor, they seized a safe containing three firearms, "crack" cocaine and marijuana, digital scales, currency, and packaging materials.

At some point prior to arrival of the search warrant, an officer asked the mother for her consent to search the house and told her that he could report her to the Department of Social Services if she did not sign the consent form because she was the guardian of her niece. The motion judge found that the mother signed the form as a result of this statement, and any consent she may have given was coerced.

On March 30, 2007, the defendant was charged with four counts of possession of a firearm or ammunition without a firearm identification (FID) card, possession of a large capacity firearm, possession of a firearm in the commission of a felony, possession of cocaine with intent to distribute, possession of a Class D substance with intent to distribute, and two counts of receiving stolen property. On November 14, 2007, the defendant filed a motion to suppress, and a judge allowed the motion.

The motion judge found that the police obtained the search warrant based on plain view observations they made during the protective sweep of the house, but that they did not possess specific and articulable facts necessary to support the sweep. The judge also found that the police conducted a search prior to obtaining the warrant. The judge based that finding on evidence

---

[3]The niece saw one of the officers open a closet and look through some sheets and towels, but there is no evidence that officers discovered contraband in this closet.

that, although the defendant was taken to a cruiser within ten minutes of his detention, police remained on the third floor for thirty minutes.

*Discussion.* The judge's findings do not support the suppression order. While executing an arrest warrant, police may conduct a protective sweep, "a quick and limited search of the premises" to protect the officers' safety, if they have a reasonable belief based on "specific and articulable facts" that the area could harbor a dangerous individual. *Maryland* v. *Buie*, 494 U.S. 325, 327, 334 (1990). As we said in *Commonwealth* v. *DeJesus*, 70 Mass. App. Ct. 114, 120 (2007), those articulable facts can be found in a defendant's "record of violent felonies and firearm possession charges." Daniel and the other members of the tactical response team knew, prior to executing the arrest, that the defendant had prior arrests related to firearms offenses. On the basis of this information, the tactical response team planned to conduct a protective sweep of the house for possible threats. See *id.* at 115-116. Thus, contrary to the motion judge's findings, the police did have the necessary "specific and articulable facts" to show that a protective sweep was warranted. Even after the defendant was in custody on the second floor, officers on the third floor could reasonably continue the protective sweep "to determine whether confederates are present who may pose a danger to the officers." *Commonwealth* v. *DeJesus*, 439 Mass. 616, 624 n.8 (2003). See *Commonwealth* v. *Walker*, 370 Mass. 548, 556, cert denied, 429 U.S. 943 (1976).[4]

As noted, the motion judge found that the officers saw contraband items on the third floor in plain view. The plain view doctrine applies to objects the police observe inadvertently if they are lawfully in a position to view the objects, they have a

---

[4]The motion judge found that the officers proceeding to the third floor knew that Daniel had placed the defendant in custody. But those officers passed Daniel as they headed to the third floor and arrived there within "three to four minutes" of entry and before the defendant was taken downstairs and placed in the cruiser. These facts distinguish this case from the unlawful "protective sweep" in *Commonwealth* v. *Nova*, 50 Mass. App. Ct. 633, 635 (2000), the case on which our dissenting colleague relies, in which police arrested the defendant, took him to the courthouse from which he had fled, and then returned to the apartment where they had arrested him and discovered contraband as they walked through the apartment looking into each of the rooms it contained.

Commonwealth *v.* Matos.

lawful right of access to the objects, and, in ases concerning contraband, weapons, or other items illegall possessed, the incriminating character of the objects is imme liately apparent. *Commonwealth* v. *Sliech-Brodeur*, 457 Mass. 00, 306 (2010). Because the officers were lawfully on the th rd floor, "[t]he admission in evidence of things inadvertently ( )served in plain view during the course of [the protective sweep would . . . be justified under the plain view doctrine." C( *nmonwealth* v. *DeJesus*, 439 Mass. at 624 n.8. Here the team r embers took the intermediary step of identifying the items that tl :y had seen during their protective sweep in an affidavit in su] )ort of a search warrant, rather than seizing them immediately. Γhus, the items that the officers recovered pursuant to a searcl warrant, which were initially seen inadvertently and in plain v ;w on the third floor during the course of a lawful protecι ve sweep, are admissible.

The invalidity of the mother's consent, and ;he defendant's claims that officers remained on the third floor )o long, or that they otherwise exceeded the scope of a proteι :ive sweep and searched the second or third floor, are immateι al, because the officers nonetheless obtained the search warran based on plain view observations made during the protective ;weep, and the items were therefore not the fruits of an imper iissible search. See *id.* at 624-625; *Commonwealth* v. *Streeter*, 71 Mass. App. Ct. 430, 438-440 (2008).

*Order allowing m tion to suppress reversed.*

GRAHAM, J. (dissenting). At approximately 6 .м. on January 23, 2007, thirteen Springfield police officers led by police Lieutenant Rupert Daniel, entered the home of he defendant's mother (mother) and arrested the defendant on ɛ warrant charging him with distribution of a class D substance As the majority notes, Daniel had information, prior to exe uting the warrant, that the only occupants of the home were ιe mother, her seven year old niece, and the defendant.[1] Daniel :nocked on the

---

[1] In the judge's memorandum of decision she found that "] aniel also testified

door, spoke to the mother, and informed her of the warrant for the defendant. The mother pointed up the stairs and stated that the defendant was "up there." Daniel, at that time, saw the defendant standing on the top of the stairs wearing a T-shirt and boxer shorts.

The defendant ran into a room on the second floor, and Daniel followed the defendant, kicked in the door to the room, ordered the defendant to the floor, and handcuffed him without incident. Approximately ten minutes later, the defendant was taken outside and placed in a cruiser.[2]

Several of the officers went past the second floor of the house to the attic, where they remained for one-half hour, knowing that the defendant had been arrested.[3] The judge made implicit findings of bad faith on the part of these officers.[4]

Clearly, the safety of police officers executing an arrest warrant is paramount. See *Commonwealth* v. *DeJesus,* 70 Mass. App. Ct. 114, 119 (2007). However, as we said in *Commonwealth* v. *Nova,* 50 Mass. App. Ct. 633, 635 (2000), quoting from *Maryland* v. *Buie,* 494 U.S. 325, 334 (1990), "the [United States Supreme] Court concluded that in order to conduct even a cursory search of areas beyond the immediate arrest site (the so-called 'lunge area,' which defines the limits of a search incident to arrest, see G. L. c. 276, § 1), there must be 'articulable

credibly that he had driven past the house prior to the raid and knew the defendant's mother, a seventeen-and-a half year employee of a communications company, and a small child lived in the house."

[2] "The credible evidence presented at the hearing supports a finding that the defendant was taken to a cruiser within ten minutes of his detention, and at the time he was barefoot, and wearing only a t-shirt and boxers." *Ibid.*

[3] "This court does not credit [Officer] Mazza's testimony that he was unaware that the defendant had been detained, and thus he went to the third floor to locate the defendant. Daniel was the first officer into the house and up the stairs. All the other officers followed him and knew Daniel had entered the second-floor room and placed the defendant in custody." *Ibid.*

[4] "Officers Wadlegger and Mazza passed Daniel and proceeded to the attic on the third floor. Both officers testified that upon entering the house the police detected a strong odor of marijuana. When asked, however, Daniel credibly testified that he did not detect any odor of marijuana, and, in fact, looked in disbelief at the question. This court credits Daniel's testimony. . . . The court, however, also credits [the mother's] testimony that while she was on the second floor, she heard footsteps coming from the attic area and that the police were in that room for thirty minutes. Thus, this court can and does reasonably infer that the police conducted a search prior to obtaining the warrant." *Ibid.*

facts' that 'would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.' " Here, the police knocked on the door of the mother's home, and she answered the door. After the police entered the home, the mother was at their side, and the defendant was clearly visible on the second floor. Thus, the police were immediately aware of the locations of the only adults in the home and had those individuals in their sight. On this record, there were no "articulable facts" to support an inference that anyone was in the home at the time of the sweep who posed a danger to the police.

Therefore, I would affirm the order of the motion judge, who properly concluded that, to the extent that the warrant here ultimately was obtained on the basis of observations made during the improper sweep search, all evidence obtained pursuant to that warrant must be suppressed.