NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-1868                                           Appeals Court

COMMONWEALTH  vs.  TERRY LYNN OWENS.

No. 14-P-1868.

Suffolk.     October 4, 2016. - September 11, 2017.

Present:  Kafker, C.J., Trainor, & Henry, JJ.[1]

Controlled Substances.  Constitutional Law, Search and seizure,
     Probable cause.  Search and Seizure, Exigent circumstances,
     Securing of premises, Expectation of privacy, Probable
     cause, Protective sweep, Warrant.  Probable Cause.
     Practice, Criminal, Motion to suppress, Warrant.

Complaint received and sworn to in the Roxbury Division of
the Boston Municipal Court Department on July 17, 2013.

A pretrial motion to suppress evidence was heard by Kenneth
J. Fiandaca, J.

An application for leave to prosecute an interlocutory
appeal was allowed by Francis X. Spina, J., in the Supreme
Judicial Court for the county of Suffolk, and the appeal was
reported by him to the Appeals Court.

Cailin M. Campbell, Assistant District Attorney, for the
Commonwealth.
Trevor Davis for the defendant.

_____

[1] Chief Justice Kafker participated in the deliberation on
this case and authored this opinion while Chief Justice of this
court, prior to his appointment as an Associate Justice of the
Supreme Judicial Court.

KAFKER, C.J.  The defendant, Terry Lynn Owens, was charged with possession of a class B substance pursuant to G. L. c. 94C, § 34.  The defendant moved to suppress evidence discovered when police officers secured a house used for prostitution while they obtained a warrant.  After an evidentiary hearing, the motion judge allowed the defendant's motion.  The Commonwealth appeals, claiming that the search was justified as a protective sweep or "freeze" to prevent the destruction of evidence.  We conclude that the limited search was permissible in these circumstances, where the officers were already in the home pursuant to an undercover "sting" operation and knew there were other people in the home who might be alerted to the officers' presence and destroy evidence before they could obtain a search warrant, was permissible.  We therefore reverse the order allowing the motion to suppress.

Background.  We recite the facts as found by the motion judge, supplemented by uncontroverted evidence drawn from the record of the suppression hearing and evidence that was implicitly credited by the judge.  See Commonwealth v. Melo, 472 Mass. 278, 286 (2015).  The judge's findings were as follows:

> "Boston Police Officers Kevin McClay and Luis Anjos . . . were, on April 8, 2013, members of the Orchard Park [s]afe [s]treet [t]eam, . . . tasked with quality of life community policing in the Orchard Park/Dudley Triangle area of the Roxbury district.  The team was in the area of 131

Eustis Street. . . . The house itself was known to officers as a place of prostitution. They knew that the owner, Farhad Ahmed, had recently been ejected by court order from a nearby home where he had been renting rooms by the hour for purposes of prostitution. They believed that Ahmed had commenced the same activity at 131 Eustis Street. Neighbors had complained to police about the prostitution being conducted at that address. Finally, police had interacted with known prostitutes and had learned from them that rooms in the house were available for use by the hour.

"On April 18, 2013, . . . officers were watching the home when they saw a man exit who they did not believe lived there. They detained him and he subsequently told the officers that he had been there to visit a prostitute. The man gave [the officers his information as well as] the name of the prostitute, 'Cinnamon,' and her contact number. Officer McClay, posing as a prospective customer, called her and made contact the next day. McClay was familiar with the interaction: the female insisted on calling him back, declined to give information, and asked for him to call back a few hours later.

"McClay called back a few hours later, as directed, and the female informed him of the services she offered. They arra[ng]ed to meet the following day, but she would not give the address. Instead, she told McClay that she would text him the address just before the appointed time. She asked McClay if he was familiar with Roxbury and told him she would be near Massachusetts Avenue.

"A few minutes later she sent a text message with the address of 131 Eustis Street. Officer McClay arrived at that address. He had arra[ng]ed with members of his team that he would alert them when . . . she accepted money from him.

"The officer sent the female a text message saying he had arrived. She told him that she would let him in, and he saw the front door of the house open. He entered, and the female then closed the door and barred it with a [two-by-four] piece of lumber. He was in the front common hall. The man known to McClay as the owner, Farhad Ahmed, was standing in the hall nearby. McClay knew that Ahmed's apartment was on the first floor rear, and that there were four or five rooms on the second floor. One or more of those rooms, McClay knew, was rented by Ahmed for [twenty

dollars] for two hours. There was testimony that Ahmed had supplies of alcohol, condoms and drugs for sale. There was no testimony as to the basis of knowledge of the officers as to the drugs and alcohol, and I do not find that the Commonwealth has established, by a preponderance of the evidence, that either were sold by Ahmed; Ahmed's history was of renting rooms in his houses for prostitution by the hour, and all of the police investigation here, both with the initial 'John' and with the female prostitute, involved the use of the premises for prostitution. Accordingly, while I find that the police officers' belief that the premises were used for prostitution was supported by specific facts known to them, I do not so find on the evidence here with respect to drugs.

"The female asked Officer McClay for [twenty dollars] to pay Ahmed. Officer McClay replied that, in fear of being robbed, he had left his wallet in his car. As the door was opened to allow McClay to go to his car, he signaled the other officers. They entered the building and arrested the owner, Ahmed, as well as 'Cinnamon.'

"Because officers had seen other people enter the house before the arrest, and because they believed that their sergeant would be seeking a search warrant, they decided to 'freeze' the entire house.[2] Police decided to get everyone out of the house. Toward that end, Officer

---

[2] Officer Kevin McClay explained at the evidentiary hearing, "My supervisor had decided . . . that the house would be frozen for a search warrant." The freezing process was described by Officer Anjos in the "particular circumstance[s]" as follows: "The freezing process is, you freeze the house, take everybody out of the house; and officers conduct a protective sweep of the entire house to make sure that nobody else is in there and nothing is moved, no evidence, nothing is taken out until we come back with a search warrant." Officer McClay also testified concerning the freezing process as follows: "We did a protective sweep to get everybody out in order to secure the house with two officers so that the warrant could be applied for. Once the house is frozen two officers are placed at that residence in any case to prevent anybody from going in and destroying evidence or whatever. And we've had problems where people do try to get back in. We've had people climb through windows, climb through the ceiling. So two officers were there. But before those officers are put in a vulnerable position, we make sure everybody's out."

Anjos decided to conduct a 'protective sweep' of the premises. He heard noise from the second floor. He ascended the stairs and entered the second room he came to. He knocked, then immediately opened the door. A female was on the bed, and a male, the defendant here, was next to a table. The defendant had an open can of beer and was sitting in front of a black pla[t]e on which was a white powder. He also had a pipe in his hand which the officer knew was of the type used to smoke crack cocaine."

The officers seized the substance and the related items during a search conducted pursuant to the warrant they had obtained. The warrant return was not introduced in evidence.[3]

In his rulings of law, the motion judge first noted that the defendant had standing to challenge the police entry into the room, as he was charged with a possessory offense. The judge then concluded that the protective sweep was not justified because there were no specific facts suggesting that the police were in danger. The judge further concluded that the search was not justified under the exigent circumstances doctrine, as there was no "specific information supporting an objectively reasonable belief that evidence [would] indeed be removed or destroyed unless preventative measures [were] taken." The judge noted, "[i]t is of no import that the police were already in the

_____

[3] There was, however, testimony that a search warrant was sought, as the motion judge found. We have confirmed the issuance of the search warrant by obtaining a copy from the trial court. See generally Commonwealth v. Gonzalez, 462 Mass. 459, 468 n.17 (2012) (court may take judicial notice of records of other courts).

first floor common hallway."  For the following reasons, we reverse.

Discussion.  "In reviewing an order allowing a motion to suppress, we consider 'the facts found or implicitly credited by the motion judge, supplemented by additional undisputed facts where they do not detract from the judge's ultimate findings.' . . .  We accept the judge's subsidiary findings of fact absent clear error, 'but conduct an independent review of [the judge's] ultimate findings and conclusions of law.' . . .  '[O]ur duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found.'"  Commonwealth v. Campbell, 475 Mass. 611, 615 (2015) (citation omitted).

1.  Reasonable expectation of privacy.  On appeal, the Commonwealth properly agrees that the defendant has automatic standing to challenge the search because he is charged with a possessory drug offense.  See Commonwealth v. Mubdi, 456 Mass. 385, 392 (2010).  The Commonwealth argues, however, that a search did not occur in the constitutional sense because the defendant did not demonstrate a reasonable expectation of privacy in the place searched.  See id. at 391 (question of standing "remains separate" from question of reasonable expectation of privacy).  In the present case, the relevant place searched is the second-floor bedroom in which the

defendant was found.  The Commonwealth argues that there was insufficient evidence to establish that the defendant or the woman with whom he was found had rented the room, and that even if one of them had, the defendant's "privacy rights and reasonable expectations are limited by the unique and transient nature of his room occupancy."  Commonwealth v. Molina, 459 Mass. 819, 825 (2011).

Although we recognize this is a somewhat novel question, given the rental-by-the-hour arrangement, we conclude that the defendant had a reasonable expectation of privacy in the room. In determining whether a defendant has a reasonable expectation of privacy, "we look to various factors . . . including the nature of the place searched, whether the defendant owned the place, whether he controlled access to it, whether it was freely accessible to others, and whether the defendant took 'normal precautions to protect his privacy' in that place." Commonwealth v. Porter P., 456 Mass. 254, 259 (2010), quoting from Commonwealth v. Pina, 406 Mass. 540, 545, cert. denied, 498 U.S. 832 (1990).  Here, it was reasonable to find, or at least to infer, that the room was paid for and that the door was closed to protect the privacy of the renters.  Both officers testified to their belief that the rooms in the house were rented by the hour.  There was no evidence to suggest that the rental period had expired or that the defendant had abandoned

the room.  See Commonwealth v. Paszko, 391 Mass. 164, 184-185 (1984) (defendant had reasonable expectation of privacy in motel room for duration of rental period and prior to abandonment of room).  See also Stoner v. California, 376 U.S. 483, 490 (1964) ("No less than a tenant of a house, or the occupant of a room in a boarding house, . . . a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures").

This is also not a case where the defendant was "unlawfully on the property searched," and therefore would have neither standing nor a reasonable expectation of privacy.  Mubdi, 456 Mass. at 393 n.8.  When the evidence suggests the defendant is akin to a trespasser, he lacks both.  See ibid.  Engaging in unlawful activity on the property, however, is a different question from whether the defendant is unlawfully on the property.  See Commonwealth v. Morrison, 429 Mass. 511, 514 (1999) ("What deprives this defendant of a reasonable expectation of privacy is not his status as a law violator in general"); Mubdi, supra ("We need not address [the] exception [to automatic standing] here, because there is no evidence that the defendant was unlawfully in the [place] that was searched").  Here, the defendant was lawfully on the property due to the rental of the room by the hour, and therefore had both standing and a reasonable expectation of privacy.

2.  Protective sweep.  The Commonwealth first attempts to justify the search as a protective sweep for officer safety.  We disagree.  For a search to be justified as a protective sweep, the officer must have "a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]' the officer in believing . . . that the area swept harbored an individual posing a danger to the officer or others."  Maryland v. Buie, 494 U.S. 325, 327 (1990), quoting from Michigan v. Long, 463 U.S. 1032, 1049-1050 (1983).  See Commonwealth v. Colon, 449 Mass. 207, 216-217 (2007).  In the present case, the hearing transcript supports the motion judge's finding that there was no reasonable basis for suspecting that persons present in the house posed a danger to the police or to others.  There was no evidence that the prostitution business reportedly conducted at the house or by Ahmed in the past included incidents of violence.  See Commonwealth v. Nova, 50 Mass. App. Ct. 633, 635 (2000); Commonwealth v. DeJesus, 70 Mass. App. Ct. 114, 119-120 (2007).  Nor was there any other testimony reflecting specific concerns about violence here.  Absent such proof, the sweep, as the motion judge found, could not be justified as one to prevent harm to the police.[4]

---

[4] The parties did not have the benefit of Commonwealth v. Saywahn, 91 Mass. App. Ct. 706, 709 (2017) (that defendant was

3.  <u>Limited search after lawful entry to prevent destruction of evidence while warrant was sought</u>.  We agree with the Commonwealth, however, that the search was justified to prevent the removal or destruction of evidence.  There was significant, uncontroverted testimony that the officers were securing the building from within to preserve evidence while they sought a search warrant.  See Commonwealth v. Blake, 413 Mass. 823, 829 (1992) ("Securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure"); Commonwealth v. Ware, 75 Mass. App. Ct. 220, 233 n.13 (2009) ("Securing or 'freezing' a dwelling while waiting for a search warrant is not unreasonable").  There was ample testimony about a number of people being present in the building, justifying the officers' concerns about the destruction of evidence.  See Commonwealth v. Streeter, 71 Mass. App. Ct. 430, 439-440 (2008) ("officers were allowed to perform a limited search of the apartment to determine that no one else was present who could have . . .destroyed the evidence remaining in the apartment").  There was also specific testimony regarding what that evidence might be.  The motion judge himself recognized that there was testimony regarding Ahmed's provision

_____

already secured at front door of home and could easily have been removed safely when officers went upstairs to conduct sweep "cuts against" permissibility of protective sweep).

of condoms, and the judge apparently credited this testimony in contrast to the testimony about alcohol and drugs.[5]  In sum, the judge improperly concluded that the officers lacked the legal authority to secure the house from within to preserve evidence of the crime of operating a place of prostitution.

Our holding is not inconsistent with Commonwealth v. DeJesus, 439 Mass. 616 (2003), which must be read in its proper factual and legal context.  In that case, the Supreme Judicial Court held that "police officers who secure a dwelling while a warrant is being sought in order to prevent the destruction or removal of evidence may not enter that dwelling, in the absence of specific information supporting an objectively reasonable belief that evidence will indeed be removed or destroyed unless preventative measures are taken."  Id. at 621.

---

[5] Although the search warrant apparently was not introduced in evidence, the application for the warrant referenced condoms as well as lubricants and photographic evidence.  See Commonwealth v. Lopera, 42 Mass. App. Ct. 133, 139 n.6 (1997) ("the presence of used and unused condoms" and "lubricating jellies," inter alia, in room provided sufficient evidence of operating house of prostitution to withstand defendant's motion for required finding of not guilty).  See also State v. McGraw, 19 Kan. App. 2d 1001, 1010 (1994) ("condoms scattered around the floor" of club supported conviction of maintaining house of prostitution).  Other evidence that the house was being used as a place of prostitution could include the conditions of the rooms, sex toys, or even the identity of known sex workers found on the premises.  See Wells v. State, 27 Okla. Crim. 370, 371-372 (1924) (sufficient evidence supported conviction of maintaining house of prostitution where known prostitutes were found in house, premises had "general reputation" of being place of prostitution, and, during police raid, man was found in room with woman who was "almost entirely undressed").

DeJesus, however, involved an arrest that took place away from the defendant's apartment, and a situation in which the officers had no reason to believe that anyone was in the apartment when they entered it. See id. at 617-618. The officers had received a key to the apartment from the defendant upon his arrest and the officers then traveled to the apartment, knocked loudly, and announced their presence. See id. at 618. When they heard no response, they proceeded to use keys taken from the defendant at the time of his arrest to open the door to the apparently unoccupied apartment. Ibid. They then entered the apartment and checked the rooms inside to see if anyone was present. See ibid. See also Commonwealth v. McAfee, 63 Mass. App. Ct. 467, 474 & n.5 (2005) (no need to go to defendant's apartment and secure it from within when there was no evidence that his confederate, who had been stopped outside apartment, "had an opportunity to contact the defendant"; court emphasized "the complete absence of evidence of a risk that the defendant had discovered or been informed of the police investigation or the detention of his recent customer").

By contrast, the police in this case were already inside the house legally when they sought to secure it. They also knew there were other people present in a position to remove or to destroy evidence. See Streeter, 71 Mass. App. Ct. at 437 (officers heard what they believed to be multiple people

"running around" in apartment and occupant admitted that his "friend" was in apartment). Officer McClay testified that he saw two people going into the house and Officer Anjos testified that he could "hear people upstairs talking and walking about." These facts readily distinguish this case from DeJesus and its requirement that police may not enter the house and secure it from within. See Streeter, supra at 436-437 (distinguishing DeJesus on basis that officers "were legally in the hallway of the apartment" when they smelled marijuana and "heard running sounds within the apartment"). The court in DeJesus, supra at 623-624, in fact, emphasized that "[t]here was no indication whatsoever that the dwelling was occupied at the time -- the officers had no knowledge that anyone was inside, there was no response to their knocking at the door, and they apparently heard no sounds coming from within. . . . [A]ny evidence located within an unoccupied dwelling can be fully protected by controlling access to that dwelling from the outside."

We also disagree that the police were precluded from securing the house from within because they could have proceeded with a warrant in the first place and avoided any exigency. Although the police had probable cause to believe that the house was being used as a place of prostitution based on the testimony of the neighbors, their interviews with known sex workers, and

their interview with the man leaving the location on April 18,[6] they also had legitimate reasons to proceed with the sting operation with Cinnamon and therefore develop firsthand conclusive evidence of prostitution at the location before proceeding any further. See Commonwealth v. Mullane, 445 Mass. 702, 704 (2006) (police went undercover to investigate massage "school" alleged to be front for illicit sexual activity); Commonwealth v. Purdy, 459 Mass. 442, 444-445 (2011) (police conducted undercover operation in suspected house of prostitution); Commonwealth v. Matos, 78 Mass. App. Ct. 578, 580 (2011) (police went undercover in "sting" operation to investigate suspected prostitution activities in hotel). Compare Commonwealth v. Forde, 367 Mass. 798, 803 (1975) (where police "offer[ed] no justifiable excuse for their prior delay in obtaining a warrant" even though they had probable cause and

---

[6] We note that the court in DeJesus recognized that "regardless of the illegality of the initial entry and search [in that case], the evidence is admissible as long as the affidavit in support of the application for a search warrant contains information sufficient to establish probable cause . . . apart from the observation[s arising out of the illegal search]." Id. at 625. In the present case, the motion judge could not uphold the search on this ground because he was not presented with the search warrant or the affidavit. We do note, however, that the four corners of the affidavit, which we have received from the trial court, appear to establish probable cause absent the evidence observed in the search of the second-floor bedroom. See Commonwealth v. Mullane, 445 Mass. 702, 705-707 (2006) (probable cause existed to support warrant obtained to search alleged house of prostitution based on statement of informant and affidavit of police officer who posed as customer).

planned to obtain warrant for more than one week; exigency that was created was foreseeable and did not justify warrantless search).

By far, the strongest evidence of prostitution that the officers uncovered at the location was their own encounter with Cinnamon inside the house. See Commonwealth v. Bell, 67 Mass. App. Ct. 266, 267 (2006) (describing "the undercover 'sting'" as "a technique that has become integral to law enforcement"). At that point, they did not need to rely on the testimony of sex workers or "Johns," or the observations of neighbors outside the house to prove their case. After the successful undercover operation, the officers also had good reason to secure the upstairs as well as the downstairs to prevent the destruction of evidence of prostitution elsewhere in the house. Compare Commonwealth v. Lopera, 42 Mass. App. Ct. 133, 139 n.6 (1997). The police conduct here was reasonable from start to finish, including the entry to negotiate sex for a fee to conclusively prove the case, the arrest of the sex worker and the operator of the brothel, and the securing of the occupied house from within to preserve evidence by officers already lawfully inside the building. The purpose of the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights is to preclude unreasonable, not reasonable, police conduct. This was not the case of an unjustified failure to

proceed by warrant or a manufactured exigency.  Cf. <u>Forde</u>, 367 Mass. at 801-803; <u>McAfee</u>, 63 Mass. App. Ct. at 474-475.

<u>Order allowing motion to
suppress reversed</u>.

HENRY, J. (dissenting).  I agree with the reasoning of the majority except for its holding that exigent circumstances justified the warrantless entry by police into the dwelling's upstairs on grounds that evidence would be removed or destroyed unless protective measures were taken.[1]

Where, as here, the police gained lawful entry to some portion of a dwelling, that entry does not abrogate the traditional principles of search and seizure that apply to the remaining portions of the residence.  See generally Commonwealth v. Gray, 465 Mass. 330, 344-345 (2013), citing Commonwealth v. DeJesus, 439 Mass. 616, 621, 624 (2003).  Those principles, with which the majority does not disagree, state that "'[t]he right of police officers to enter into a home, for whatever purpose, represents a serious governmental intrusion into one's privacy. It was just this sort of intrusion that the Fourth Amendment [to

---

[1] The majority also responds to the defendant's argument, made for the first time on appeal, that the exigency was created by the police, and concludes that the police did not act improperly.  Ante at    .  I believe this conclusion is subject to challenge given the extensive information that the police had at least one day before entering the dwelling.  See Commonwealth v. Mullane, 445 Mass. 704-708 (2006) (search warrant for business that was used as place for unlawful sexual intercourse was properly obtained before undercover officer made arrangements for services and entered building for such services, with that event triggering execution of warrant). Because, however, the issue was not presented during the hearing on the motion to suppress, its merits "were never meaningfully addressed" and the motion judge made no findings or rulings on the merits.  Commonwealth v. Mauricio, 477 Mass. 588, 594 (2017).  The issue is therefore waived, and I would have declined to address its merits.  See ibid.

the United States Constitution and art. 14 of the Massachusetts Declaration of Rights were] designed to circumscribe by the general requirement of a judicial determination of probable cause.' . . . Federal and State case law delineates clear boundaries for permissible entry by police officers into a home in order to search or arrest.  In the absence of a warrant, two conditions must be met in order for a nonconsensual entry to be valid:  there must be probable cause . . . and there must be exigent circumstances" that made obtaining a warrant impracticable.  DeJesus, supra at 619.  Exigencies that permit a search or seizure "without [a] warrant are a narrow category and must be established by the Commonwealth" which bears a heavy burden of proof.  Commonwealth v. Ramos, 470 Mass. 740, 745 (2015) (citation omitted).  See Commonwealth v. Tyree, 455 Mass. 676, 684 (2010); Commonwealth v. White, 475 Mass. 583, 588 (2016).

Here, where the claimed exigency is the loss of evidence, the Commonwealth must show that the police officers had "specific information supporting an objectively reasonable belief that evidence will indeed be removed or destroyed unless preventative measures are taken."  DeJesus, 439 Mass. at 621.

The question before us, then, is whether the Commonwealth established such specific information.  As the majority notes, and I agree, there was "ample" evidence that there were a number

of people in the upstairs rooms. <u>Ante</u> at    . Specifically,
the motion judge credited the testimony that the police had seen
other people enter the house shortly before the police did, that
the police heard people walking around and talking on the second
floor once the officers were inside, and that the police
reasonably believed the premises were being used for
prostitution. And, as the majority also indicates, there was
testimony that Ahmed provided condoms to those who used the
house. <u>Ante</u> at    . In sum, the evidence adduced at the
hearing that related to the crime under investigation included
condoms and the identity of the sex workers and their customers.[2]
To justify the entry to search for this evidence, the
Commonwealth must show "an objectively reasonable belief that
evidence will indeed be removed or destroyed" absent preventive

---

[2] I note that there has been significant movement toward
prohibiting condoms from being used as evidence to prove charges
related to prostitution. Where the possession of condoms is
considered incriminatory evidence, it discourages sex workers
from carrying condoms out of fear that doing so will increase
the likelihood of arrest and conviction, with the result that
sex workers engage in unprotected sex and risk endangering
public health by contracting and transmitting sexually
communicable diseases. See Human Rights Watch, Sex Workers at
Risk: Condoms as Evidence of Prostitution in Four US Cities,
(July 19, 2012), http://www.hrw.org/report/2012/07/19/sex-
workers-risk/cndoms-evidence-prostitution-four-us-cities
[https://perma.cc/XR3R-XX26]. In 2015, the State of New York
statutorily prohibited evidence that any person was in
possession of one or more condoms in any prosecution of that
individual for prostitution. See N.Y. Crim. Proc. Law § 60.47
(McKinney's 2016). In view of these concerns, I am reticent to
view condoms as proof of the crimes at issue, but I recognize
the law in Massachusetts is otherwise.

measures. DeJesus, 439 Mass. at 621. Here, no testimony suggested that anyone in the dwelling knew the police were inside; nor was there any testimony that any occupant was engaged in suspicious activity that suggested evidence would be secreted or destroyed. The mere presence of individuals in a dwelling, standing alone, does not establish an objectively reasonable belief that evidence will be removed or destroyed.[3] This standard does not encompass a belief that in the future, if certain events transpire, evidence will be lost or destroyed. See, e.g., Ramos, 470 Mass. at 746 (warrantless entry of garage upheld to prevent destruction of evidence where police heard sounds inside garage that by objective standard indicated that people were there and that evidence related to stolen vehicle therein was being destroyed). See also Tyree, 455 Mass. at 685 (evidence did not support belief that evidence would be lost or

---

[3] Moreover, there was little, if any, risk that the identity of the individuals in the dwelling would be lost if the rooms were not immediately searched. The police were entitled to secure the building from the outside, Commonwealth v. Yesilciman, 406 Mass. 736, 743 (1990), and anyone leaving the premises could be stopped and questioned in accordance with Terry principles. See Terry v. Ohio, 392 U.S. 1, 13 (1968). See generally Commonwealth v. Catanzaro, 441 Mass. 46, 53 (2004) (while executing a warrant, police properly stopped an occupant of apartment who was walking away from dwelling to question her about suspected criminal activity that was subject of warrant); Commonwealth v. Bostock, 450 Mass. 616, 619 (2008) (within minutes of two break-ins and in general area of alleged crimes, that defendant was found and matched description given independently by two witnesses constituted reasonable suspicion to stop).

destroyed absent immediate action); Commonwealth v. Streeter, 71 Mass. App. Ct. 430, 437 (2008) (sound of running and suspicious conduct justified entry where officer smelled marijuana that could be removed or destroyed); Commonwealth v. Sueiras, 72 Mass. App. Ct. 439, 442 (2008) (entry into home justified by exigent circumstances where there was probable cause that adult had supplied minors with alcohol, and if officer had secured scene from outside, it was reasonable to believe that empty containers as well as alcoholic beverages that he had observed from looking through windows of home "could have been taken out the back door or hidden from him").

Nor do the cases cited by the majority support the position that the mere presence of individuals in a residence constitutes exigent circumstances. Specifically, in Ware, the police conducted a protective sweep to locate a specific firearm that was unaccounted for when the defendant was arrested. Commonwealth v. Ware, 75 Mass App Ct. 220, 233 (2009). Moreover, the seizure of the firearm was justified because the police later obtained a warrant. See ibid. In Blake, the court ruled that the warrant obtained by the police was based entirely on facts independent of the observations made during a protective sweep. See Commonwealth v. Blake, 413 Mass. 823, 830 (1992). Finally, in Streeter, 71 Mass. App. Ct. at 437-438, the result turns on a traditional exigent circumstances analysis.

While outside the defendant's apartment investigating an unrelated crime, the police smelled a strong odor of marijuana coming from inside the defendant's apartment. Id. at 431. When the police knocked on the door, they heard a commotion inside and the defendant came out a rear door and locked the door behind him. Id. at 431-432. The defendant admitted he had smoked marijuana and appeared shaky. Id. at 432. The defendant admitted his daughter and a friend were inside the apartment. Ibid. In these circumstances, there was an objectively reasonable belief that contraband would be destroyed if the apartment door was not opened. Id. at 436-438. When the defendant opened the door, the police observed marijuana in plain view on a kitchen table. Id. at 432.

The police in this case were at a loss during the suppression hearing to articulate specific evidence or information that led them to act. Instead, the generic explanations offered in relation to why they were clearing the rooms, were "to make sure that . . . nothing is moved, no evidence, nothing is taken out"; and "to prevent anybody from going [back] in and destroying evidence or whatever."[4]

In view of these circumstances, I agree with the motion judge that the Commonwealth had not met its burden to show "an

---

[4] The police testimony is more fully outlined in the majority's opinion. See ante at note 2.

objectively reasonable belief that evidence will indeed be removed or destroyed unless preventative measures are taken." DeJesus, 439 Mass. at 621.